[No. H032414. Sixth Dist. Apr. 7, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JAFFARI ZAMANI, Defendant and Appellant.

Counsel

Syda Kosofsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Christopher J. Wei, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**MIHARA, Acting P. J.**—Defendant Michael Jaffari Zamani was convicted by jury trial of felony appropriation of lost property (Pen. Code, § 485). The trial court suspended imposition of sentence and placed him on probation. On appeal, he contends that the trial court prejudicially erred in (1) failing to instruct the jury that the offense required a specific intent, (2) failing to instruct the jury on mistake of fact, and (3) instructing the jury that mistake of law was not a defense. He also asserts that his trial counsel was prejudicially deficient in failing to offer a proper theory of admissibility for his prior act of returning property to its true owner. We hold that the crime of appropriation of lost property is not a specific intent offense, and we find no prejudicial instructional error and no deficiency of counsel. Accordingly, we affirm the judgment.

## I. Factual Background

Two test circuit boards owned by QuickSilver Technology, Inc. (QuickSilver), each containing four semiconductor chips, were "lost in transit" in February 2004 while being transported from San Jose to the San Francisco airport. Each of the chips on the boards bore a QuickSilver logo. QuickSilver had manufactured only 14 of these test boards. QuickSilver filed a claim with the shipper's insurance company, which paid QuickSilver $24,000 for the loss.

Jerry Farmer was an engineer who bought and sold "high tech engineering products" on eBay. In August 2004, Farmer bought two circuit boards from Silicon Valley Compucycle (SVC) through eBay. Farmer recognized that the boards were worth "thousands" but were being sold for $74.95 plus $14.95 for shipping, so he assumed that SVC "probably didn't know what they were

selling." Farmer received the boards in the mail about a week later. The two boards were QuickSilver's missing test boards. Farmer wanted to learn more about the boards, so he contacted QuickSilver and asked for a manual. The QuickSilver technician he spoke with asked Farmer for the serial numbers on the boards, and Farmer provided him with the serial numbers.

Farmer thereafter spoke by telephone with Rick Hawker, a QuickSilver employee, who requested a photograph of the boards, which Farmer provided. Farmer told Hawker that he had acquired the boards from SVC. Hawker told Farmer that the boards had been lost or stolen and were worth $24,000. Hawker offered to recompense Farmer for the $74.95 that Farmer had paid for the boards. Farmer suggested that he would like a "reward" of $1,000 for the return of the boards. Hawker rejected that idea and demanded that the boards be returned. Farmer did not trust Hawker because Hawker suggested that Farmer was a greedy thief.

Hawker contacted Shaw Roohparvar at SVC and informed Roohparvar that the boards had been "lost or stolen" from QuickSilver. Hawker received a response from Roohparvar informing him that SVC would refund Farmer's money, have him return the boards to SVC, and then SVC would return the boards to QuickSilver. Roohparvar asked for QuickSilver's address. Hawker replied that he had already offered a refund to Farmer but Farmer wanted a reward. Roohparvar assured Hawker that he would get the boards back from Farmer and return them to QuickSilver.

Farmer also contacted Roohparvar and told him what Hawker had said about the worth of the boards. Roohparvar offered to refund Farmer his money if Farmer would return the boards to SVC. Roohparvar told Farmer that defendant Michael Jaffari Zamani would facilitate the return of the boards to QuickSilver, and Roohparvar put Farmer in contact with defendant. Farmer was given the impression that defendant was Roohparvar's lawyer. Defendant told Farmer that Farmer would receive any reward that was obtained. Farmer returned the boards to SVC in late August 2004.

Farmer subsequently spoke to Bryan Wang at QuickSilver and told Wang that he had returned the boards to SVC for defendant to return to QuickSilver. Wang told Farmer that there would be a reward, and Farmer relayed this information and Wang's contact information to defendant.[1] At some point, Roohparvar told Wang that defendant would return the boards to QuickSilver. Roohparvar never authorized defendant to obtain a payment of money from QuickSilver in exchange for return of the boards.

---

[1] Farmer never received a reward or even a refund from SVC.

Defendant telephoned Wang on September 3, 2004, and told Wang that he was a mediator working for SVC as a consultant. When Wang asked defendant how the boards were going to be returned, defendant said that he needed to confirm that the boards belonged to QuickSilver and asked if QuickSilver had filed an insurance claim. Wang offered to provide defendant with whatever documentation of ownership he required. Wang told defendant that QuickSilver had filed an insurance claim and been paid $24,000 on that claim.[2] Defendant then stated that the boards no longer belonged to QuickSilver but to the insurance company.

Defendant told Wang that QuickSilver should "purchase the boards from him rather than offer him some type of reward" so that "we wouldn't need to tell the insurance company anything." Defendant suggested that he wanted a payment of $20,000. Wang said he "wasn't really interested in going down that route . . . ." Wang expressed surprise at defendant's suggestion and told defendant that he had understood that defendant's role was to arrange the return of the boards to QuickSilver. Defendant said: "[W]ell, yes, but that was before we knew we were sitting on a gold mine." Wang told defendant: "[I]f his objective was to somehow gain financially from the fact of these lost or stolen boards, that I think I would think that that would be despicable . . . ."

Defendant asked Wang for the name, telephone number, and e-mail address of the insurance company, and he asked Wang to give defendant's contact information to the insurance company. However, defendant refused to provide Wang with his address. Wang refused to provide to defendant information about the insurance company because he believed that defendant would try to "extract money" from the insurance company. Defendant followed up his telephone conversation with Wang with an e-mail in which he invited Wang to make a "counteroffer." Defendant said that his "client" wanted $10,000 for the return of the boards. In the e-mail, defendant told Wang that SVC had purchased the boards from a "dumpster diver."

QuickSilver turned this matter over to its attorneys. On September 9, 2004, one of QuickSilver's attorneys sent defendant a letter in which she offered a $1,000 reward for the return of the boards and assured defendant that QuickSilver would notify the insurer of its recovery of the boards upon their return. She asked him to return the boards by September 20. Attached to her letter was documentation regarding the loss of the boards by the shipper. Defendant responded with an e-mail in which he claimed that the boards now belonged to SVC. He sought a payment of $8,000 for the boards. QuickSilver's attorney responded by reiterating the $1,000 reward offer, inviting defendant to turn the boards over to the police if he had any doubts

---

[2] The boards were not worth just $24,000. That was the cost for QuickSilver to build them. QuickSilver valued the boards at $48,000.

about QuickSilver's ownership rights, and giving him a deadline of October 1. Defendant still did not return the boards. Instead, he insisted on a three-way meeting with the insurance company. The attorney assured defendant that QuickSilver would comply with its obligation to notify the insurance company of the recovery and would provide defendant with a copy of that notice. She was unwilling to put him in contact with the insurer because she believed that defendant wanted to extract money from the insurance company. Defendant still did not return the boards. He continued to seek more than the $1,000 reward that had been offered.

Another of QuickSilver's attorneys telephoned defendant in early November 2004 and asked him to return the boards. Defendant refused to return the boards until he could communicate with the insurance company. Although defendant claimed that he would not try to obtain money from the insurance company, QuickSilver's attorneys did not believe him. The attorney told defendant that she would not negotiate about the return of the boards, and, if the boards were not returned in 24 hours, the matter would be turned over to the police. Wang contacted the police in November 2004. In November 2006, the boards were found in a box in defendant's home when the home was searched pursuant to a search warrant.

## II. Procedural Background

Defendant testified on his own behalf at his preliminary examination. He was thereafter charged by amended information with felony appropriation of lost property (Pen. Code, § 485).

Defendant was the sole defense witness at trial. He testified that his friend Roohparvar called him in August 2004 and said he had sold some boards on eBay that turned out to be stolen and "wants to know how he can get them back to the company." Roohparvar asked defendant to handle the return of the boards because Roohparvar was going to be out of the country for an extended period of time. Roohparvar told defendant that QuickSilver wanted SVC to pay Farmer a $1,000 reward for the return of the boards. Defendant drafted an e-mail for Roohparvar to send to Farmer asking him to return the boards either to Hawker at QuickSilver or to Roohparvar. Farmer informed defendant that Hawker had told him that the boards were worth $24,000 each. Farmer told defendant that he was not going to give the boards back unless he received some money. Roohparvar brought the boards in a box to defendant's house. He told defendant to give the boards back to QuickSilver,

and he did not ask defendant to obtain any payment for him for the boards. Roohparvar said defendant "could keep whatever money [he] could get out of the boards," and defendant told Roohparvar "I want $10,000 but I didn't tell him why I'm doing it."

Defendant spoke to Wang, and Wang was "[v]ery hostile" and evasive. Wang told defendant that QuickSilver had received insurance proceeds, but he refused to provide defendant with information about the insurance carrier. Defendant wanted to "set these people up to see if they're going to do insurance fraud," so he asked Wang for $10,000. He subsequently communicated with QuickSilver's attorney and asked her for $8,000. He did this to see if she would "bite" so that he could "file a claim with the Department of Insurance." Although both Wang and QuickSilver's attorney told defendant that they would notify the insurance carrier, defendant did not believe them.

Defendant testified that he believed: "When you have an item insured and it is lost or destroyed, when you file a claim and you receive insurance proceeds, according to the insurance contract, you subrogate your rights to the insurance company. That means that you're [*sic*] no longer own that thing because you receive the proceeds for it." "According to me, they received insurance proceedings [*sic*] and they didn't own them any more." Because of Wang's attitude and the fact that QuickSilver had not filed a police report regarding these "expensive boards," defendant suspected that "something isn't right . . . ." He thought that QuickSilver might have filed two separate insurance claims for the same loss. Defendant testified that he thought he would be committing a crime if he returned the boards to QuickSilver because he would be assisting QuickSilver "to pursue a fraudulent claim."

Defendant testified that he had not taken the boards to the police because "I figured that their plan was I take it to the police and they go out and pick it up from the police" without disclosing anything to the insurance company. He claimed that he had eventually called the sheriff's office and spoken to a deputy who told him that it was a civil matter that the sheriff's department would not handle. Defendant asserted that he would have returned the boards to the insurance company. He also insisted that, had QuickSilver paid him $10,000 or $8,000, he would have "given the boards back and I would have taken the check and the correspondence to the Department of Insurance." Defendant testified that he did not want to gain money for himself but was only trying to do a favor for Roohparvar. Defendant admitted that he had never mentioned during his testimony at the preliminary examination that he had been "trying to set up QuickSilver for an insurance fraud claim."

The prosecutor submitted a proposed instruction on the elements of the charged offense. "In order to prove the defendant guilty of the crime charged in Count One, appropriation of lost property, the People must prove, one, defendant found lost property under circumstances which gave him either the knowledge of the true owner or the means to find the true owner, and, two, defendant appropriated that property to his use or the use of another person without first making reasonable and just efforts to find the true owner and return the property to him or her." The trial court characterized the proposed instruction as "a relatively straightforward parsing of the statute," and defendant's trial counsel agreed that the proposed instruction correctly set forth the elements of the offense.

Defendant's trial counsel asked the court to give CALCRIM No. 3406 on mistake of fact. She asserted that defendant's belief that returning the boards to QuickSilver would be a violation of law and his belief that QuickSilver was no longer the true owner of the boards were mistakes of fact. The trial court concluded that these were mistakes of law and that there was no evidence of a mistake of fact. In addition, the court stated that, because the charged offense was a general intent crime, a mistake of fact instruction would be inapplicable. The court declined to instruct on mistake of fact. Defendant's trial counsel objected without elaboration to the court's instruction on mistake of law, CALCRIM No. 3407. The court overruled the objection.

The trial court gave the following instructions to the jury. "The crime charged in this case requires proof of the union or joint operation of act and wrongful intent. In order to be guilty of the crime of appropriation of lost property, a person must not only commit the prohibited act but must do so intentionally or on purpose. The act required is explained in the instructions for the crime. However, it is not required that he or she intend to break the law." "Let me now define for you the crime of appropriation of property. Anyone who finds lost property under circumstances which give him or her knowledge of or means of inquiry as to the true owner and who appropriates such property to his or her own use or to the use of another person not entitled thereto, without making reasonable and just efforts to find the owner and restore the property to the owner, is guilty of the crime of appropriation of property. [¶] In order to prove that the defendant is guilty of this crime, the people must prove that, one, the defendant found lost property under circumstances which gave him either the knowledge of the true owner, or means to find the true owner; and two, the defendant appropriated that property to his use or the use of another person without first making reasonable and just efforts to find the true owner and return the property to him or her." "If you conclude that the people have proved that the defendant committed the crime of appropriation of property, the return or offer to return of the property wrongfully appropriated is not a defense to that charge. It is not a defense to

the crime of appropriation of property that the defendant did not know he was breaking the law or that he believed that his act was lawful."

The prosecutor described the intent element of the crime in his argument to the jury. "So general intent as it relates to this case, again, doesn't mean that he has to know that what he's doing is against the law. It means that he has to intentionally do the act which is against the law. He has to intentionally appropriate the property, intentionally use the property for his own purpose rather than give it back. He doesn't have to know that it's against the law to do that." "The way he appropriates it for his own use is to try to get money out of it; that is appropriating it for his own use." Defendant "did this to line his own pockets."

Defendant's trial counsel argued to the jury that defendant had believed that QuickSilver no longer owned the boards and the insurance company was the true owner of the boards. She asserted that defendant had made "reasonable and just efforts" to find the true owner and return the property.

The jury returned a guilty verdict. The trial court suspended imposition of sentence and placed defendant on probation. Defendant timely filed a notice of appeal.

## III. Discussion

### A. Instruction on Mental State Element

Defendant contends that the trial court prejudicially erred by failing to instruct the jury that a violation of Penal Code section 485 is a "specific intent" offense that requires proof that defendant intended to "permanently deprive the owner of his or her property."

Penal Code section 485 is one of a number of separate statutes in chapter 5 of title 13 of part 1 of the Penal Code which define various "theft" offenses. Penal Code section 485 reads: "One who finds lost property under circumstances which give him knowledge of or means of inquiry as to the true owner, and who appropriates such property to his own use, or to the use of another person not entitled thereto, without first making reasonable and just efforts to find the owner and to restore the property to him, is guilty of theft." (Pen. Code, § 485.) Penal Code section 485 plainly does not explicitly identify any required specific intent.

Penal Code section 484 defines as theft various "felonious[]" takings.[3] The word "felonious[]" has been held to import the common law's specific intent requirement into Penal Code section 484's description of these takings as thefts. (*People v. Avery* (2002) 27 Cal.4th 49, 55, 58 [115 Cal.Rptr.2d 403, 38 P.3d 1].) Penal Code section 485, unlike Penal Code section 484, contains no reference to a "felonious[]" appropriation. Thus, the statutory language contains no indication that the Legislature intended to import the common law's specific intent requirement into Penal Code section 485.

The only mental state mentioned in Penal Code section 485 is the perpetrator's "knowledge." The crime is defined in terms of two acts, one omission, and one mental state. The perpetrator commits this offense if he or she (1) finds lost property (an act), (2) appropriates it (an act), (3) fails to make "reasonable and just efforts" to find the owner and restore the property to the owner (an omission), and (4) does so with knowledge of the true owner or means of inquiry as to the true owner (a mental state). Nowhere in the statutory definition of the offense is there any suggestion that the perpetrator must harbor any additional specific intent.

We can find no justification for importing Penal Code section 484's specific intent requirement into Penal Code section 485. Neither the proximity of Penal Code section 485 to Penal Code section 484 nor the fact that both statutes appear in the same chapter leads to the conclusion that they share a specific intent requirement. Not all of the "theft" offenses in Penal Code, part 1, title 13, chapter 5, not even those in closer proximity to Penal Code section 484, include specific intent requirements. Penal Code section 484c, for instance, provides: "Any person who submits a false voucher to obtain construction loan funds and does not use the funds for the purpose for which the claim was submitted is guilty of [theft]."[4] (Pen. Code, § 484c.) This statute, which is more closely proximate to Penal Code section 484 than Penal Code section 485 is, mentions no specific intent requirement and does not use the word "feloniously" to import the common law's specific intent requirement. The fact that Penal Code section 485 and Penal Code section 484 are both classified as "theft" offenses also does not mean that the two offenses have

---

[3] Penal Code section 484, subdivision (a) provides: "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

[4] "Wherever any law or statute of this state refers to or mentions larceny, embezzlement, or stealing, said law or statute shall hereafter be read and interpreted as if the word 'theft' were substituted therefor." (Pen. Code, § 490a.)

the same mental state element. For example, a number of different offenses are classified as "rape" in Penal Code section 261 even though those offenses include both general intent and specific intent crimes. (Pen. Code, § 261, subd. (a)(2) [general intent], (5) [specific intent].)

Defendant relies on *People v. Buelna* (1889) 81 Cal. 135 [22 P. 396] (*Buelna*) to support his claim that Penal Code section 485 is a specific intent crime. His reliance is misplaced. In *Buelna*, the defendant was charged by information with "grand larceny" and convicted as charged. He argued on appeal that the trial court had erred in instructing the jury with the language of Penal Code section 485. (*Buelna*, at p. 136.) He did not claim that instruction in the language of Penal Code section 485 was legally incorrect, but only that the instruction was inappropriate in his case because the information charged him with grand larceny, a different offense. The court rejected his contention using this language: "It will be seen at a glance that it was not the legislative intent to create, by the enactment of these provisions of law, any two distinct kinds of larceny, such as the defendant insists upon. The first section defines larceny generally; the second section declares a rule of evidence which, being fulfilled, constitutes the crime as defined in the first section." (*Buelna*, at p. 137.)

■ While *Buelna*'s archaic language might seem to suggest that Penal Code section 485 is a mere "rule of evidence," that language must be understood in context. *Buelna* is an 1889 opinion. Penal Code section 485 was enacted in 1872 and was based on an 1864 New York penal statute. (*Pacific Coast Dairy v. Police Court* (1932) 214 Cal. 668, 677 [8 P.2d 140].) Until recently, the California Supreme Court was known to engage in the " ' "inaccurate practice of stating rules of substantive law in terms of rules of evidence." ' " (*People v. Friend* (2009) 47 Cal.4th 1, 75 [97 Cal.Rptr.3d 1, 211 P.3d 520].) The California Supreme Court has since clarified that when, as *Buelna* put it, a statute describes what "constitutes the crime," the statute is not a "rule of evidence," as *Buelna* described it (*Buelna, supra*, 81 Cal. at p. 137), but "is simply a valid exercise of the Legislature's power to create substantive law and define crimes." (*People v. McCall* (2004) 32 Cal.4th 175, 179 [8 Cal.Rptr.3d 337, 82 P.3d 351].) ■ Thus, *Buelna* is properly understood as holding that an information that simply charges larceny or theft is not insufficient to support a prosecution under Penal Code section 485, which is statutorily defined as a species of theft.

Indeed, the Legislature has made it clear that it understands Penal Code section 485 to define a unique species of theft that is distinct from the theft offenses described in Penal Code section 484. The Legislature has explicitly provided that a Penal Code section 485 violation may be treated by the court or charged by the prosecutor as an infraction under Penal Code section 17,

subdivision (d). (Pen. Code, §§ 17, subd. (d), 19.8.) In contrast, the Legislature has deprived courts of the discretion to treat a Penal Code section 484 violation as an infraction. The only time that the Legislature has permitted a Penal Code section 484 violation to be an infraction is when the prosecutor exercises his or her discretion to charge as an infraction a petty theft of a value under $50 (Pen. Code, § 490.1). The Legislature's more lenient treatment of Penal Code section 485 violations reflects its acknowledgement that a Penal Code section 485 violation does not have the same elements as a Penal Code section 484 violation.

Defendant cites *People v. Stay* (1971) 19 Cal.App.3d 166 [96 Cal.Rptr. 651] (*Stay*) to support his claim that Penal Code section 485 is a specific intent offense, but *Stay* tells us nothing about the nature of Penal Code section 485's mental state element. The defendant in *Stay* was charged with and convicted of grand theft. (*Stay*, at p. 168.) He claimed that his conduct, taking shopping carts and trying to obtain ransom from the owner of the carts, was authorized by Civil Code section 2080, which permits a "reasonable charge for saving and taking care of" lost property. (Civ. Code, § 2080.) The Second District Court of Appeal concluded that there was no evidence that the carts were "lost" property and therefore Civil Code section 2080 was inapplicable. (*Stay*, at p. 174.) Because the property in question was not "lost," it is clear that the defendant in *Stay* was not convicted of violating Penal Code section 485, which applies only to "lost property." Since *Stay* did not concern the required mental state for a Penal Code section 485 offense, it provides no authority for defendant's claim that Penal Code section 485 requires a specific intent.

█ Since Penal Code section 485 does not require a specific intent, the trial court did not prejudicially err in omitting a specific intent instruction.

## B. Mistake

Defendant asserts that the trial court prejudicially erred in two respects with regard to instructions on mistake: (1) it failed to instruct the jury with CALCRIM No. 3406 based on evidence that defendant mistakenly believed that the insurance company owned the boards, and (2) it instructed the jury that a mistake of law was not a defense.

CALCRIM No. 3406 provides: "The defendant is not guilty of *<insert crime[s]>* if (he/she) did not have the intent or mental state required to commit the crime because (he/she) [reasonably] did not know a fact or [reasonably and] mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as (he/she) [reasonably] believed them to be, (he/she) did not commit *<insert crime[s]>*. [¶] If you find that the defendant believed that *<insert alleged mistaken facts>* [and if you find that

belief was reasonable], (he/she) did not have the specific intent or mental state required for <*insert crime[s]*>. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for <*insert crime[s]*>, you must find (him/her) not guilty of (that crime/those crimes)."

Thus, defendant contends that the jury should have been instructed: The defendant is not guilty of appropriation of lost property if he did not have the intent or mental state required to commit the crime because he did not know a fact or mistakenly believed a fact. If the defendant's conduct would have been lawful under the facts as he believed them to be, he did not commit appropriation of lost property. *If you find that the defendant believed that the boards belonged to the insurance company, he did not have the specific intent or mental state required for appropriation of lost property.* If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for appropriation of lost property, you must find him not guilty of that crime.

■ The trial court's failure to give a mistake of fact instruction was not prejudicially erroneous. An erroneous failure to instruct on mistake of fact is reversible error only if it is reasonably probable that the giving of the instruction would have produced a result more favorable to the defendant. (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1431 [51 Cal.Rptr.3d 263].) First, defendant's mistaken belief that the boards belonged to the insurance company would not alone have established that he lacked the requisite mental state and therefore would not have absolved him of guilt. ■ A violation of Penal Code section 485 does not require *actual knowledge* of the identity of the true owner. Even if the jury had credited defendant's claim that he believed that the boards belonged to the insurance company, the jury could have concluded that defendant was nevertheless guilty because he had "means to find" that QuickSilver, rather than the insurance company, was the true owner and failed to make "reasonable and just efforts" to return the boards to QuickSilver. QuickSilver offered to provide defendant with whatever documentation of ownership he required, but defendant disregarded both this offer and the documentation that QuickSilver sent to him. And this was after both Farmer and Roohparvar had been convinced that QuickSilver owned the boards and had provided the boards to defendant for the express purpose of having the boards returned to QuickSilver.

Second, any error in failing to give some form of instruction on mistake of fact was harmless because it is highly improbable that a rational juror would have concluded that defendant not only believed that the insurance company owned the boards and lacked the means to find that QuickSilver was the owner, but also made reasonable and just efforts to return the boards to the

insurance company. The undisputed evidence of defendant's course of conduct was the antithesis of "reasonable and just." Entrusted with the simple task of returning the boards to QuickSilver, defendant abandoned that task as soon as he learned of the value of the boards and instead embarked on a mission to extract as much money as possible out of QuickSilver in exchange for the boards. His claim that he was trying to "set up" QuickSilver for insurance fraud was illogical and lacked any evidentiary support but his own trial testimony. He never mentioned this claim in his testimony at the preliminary examination, and he provided no explanation for why it was necessary to extract the largest possible amount of money from QuickSilver in order to report suspected insurance fraud to "the Department of Insurance."

Since it is not reasonably probable that a mistake of fact instruction would have produced a verdict more favorable to defendant, any error in failing to give such an instruction was not prejudicial.

Defendant's contention regarding the trial court's mistake of law instruction is based entirely on his claim that appropriation of lost property is a specific intent offense. Since we have already rejected that claim, his mistake of law contention lacks substance.

### C. Ineffective Assistance

Defendant argues that his trial counsel was prejudicially deficient in failing to identify Evidence Code section 1101 as the basis for admissibility of defendant's prior act of honest conduct to show that defendant intended to return the boards to the true owner.

On direct examination of defendant, defendant's trial counsel asked him: "Have you ever come into possession of something of value that was not yours in the past?" The prosecutor objected, and an unreported bench conference ensued. The court subsequently held a hearing outside the presence of the jury to address the issue. The defense had made an offer of proof that defendant had previously "corrected a bank error that had been made in his favor for approximately $1,000" to "show that the defendant had a character trait for honesty." The evidence "wasn't offered for credibility."[5] The prosecution had objected under Evidence Code section 1101. The court

---

[5] The prosecutor sought admission of evidence of defendant's prior misdemeanor offenses of contempt of court (Pen. Code, § 166) and unauthorized practice of law (Bus. & Prof. Code, § 6126) to impeach him. The trial court initially deferred consideration of this issue. It subsequently granted defendant's motion to exclude evidence of those prior offenses, but it made this ruling without prejudice and left open the possibility that, if the prosecutor produced evidence of precisely how these offenses were committed, he might be able to establish that the offenses were proper impeachment evidence.

ruled that the proffered evidence was inadmissible because it was a specific act that was offered to prove a character trait.

Defendant now argues that his trial counsel should have asserted that evidence of his prior act was admissible under Evidence Code section 1101, subdivision (b) to show his "lack of intent to appropriate property not belonging to him." This argument appears to rest on defendant's claim that the charged offense required a specific intent. We have already concluded that it did not. The required mental state was knowledge, and defendant's prior act had no relevance to whether he knew or had means to find the identity of the true owner of the boards. Any relevance that his prior act might have had regarding his "intent to appropriate" would be simply as evidence that he lacked the disposition to appropriate the property of another, and Evidence Code section 1101 precludes the admission of such character evidence. Consequently, his trial counsel was not deficient in failing to offer this meritless basis for admission of this evidence.

## IV. Disposition

The judgment is affirmed.

Duffy, J., concurred.

**McADAMS, J., Concurring.**—I concur in the judgment. I write separately because it is my view that appropriation of lost property is a specific intent crime and that it was error to instruct the jury that it was a general intent crime. However, I conclude that the error was harmless beyond a reasonable doubt because the court instructed the jury with the language of Penal Code section 485, which I find contains language that is the functional equivalent of the common law specific intent necessary to establish theft. Finding no other error, I would affirm the judgment.

### FACTS

I. *Prosecution Case*

A. *The Property Was Lost*

In February 2004, QuickSilver Technology, Inc. (QuickSilver), shipped two evaluation development circuit boards (Boards) to Japan for a sales presentation. TNT, USA, Inc. (TNT), was the freight forwarder for the shipment and subcontracted part of the job to Eagle Global Logistics (Eagle Global). The Boards were lost in transit.

The Boards were not sold to the general public. They were used by potential customers to test the chips that QuickSilver was developing. The chips contained QuickSilver's unique technology and intellectual property.

### B. *Silicon Valley Compucycle Obtains and Sells the Boards*

Around early August 2004, Shaw Roohparvar, the owner of Silicon Valley Compucycle (SVC), purchased the Boards from an unnamed "dumpster diver." SVC advertised the Boards for sale on eBay.

Jerry Farmer, a computer engineer in Colorado, bought the boards from SVC for $74.95, plus $14.95 for shipping and handling. Farmer thought it was "a good bargain" because the chips on the Boards were worth thousands of dollars. The chips had QuickSilver logos on them. Farmer wanted to learn more about the Boards, so he contacted QuickSilver and asked for a manual. He talked to a technician who asked him for a serial number and a photograph of the Boards.

### C. *QuickSilver Claims Ownership of the Boards*

After Farmer sent QuickSilver the requested information, Rick Hawker, a QuickSilver executive, contacted him. Hawker told Farmer the Boards had been lost, that there was insurance involved, and that the Boards were worth about $24,000. Based on those facts, Farmer thought it would be reasonable to ask for a reward and asked for $1,000.

Hawker did not think anyone should receive a reward. He offered to pay Farmer what he had paid for the Boards and demanded that the Boards be returned. Hawker called Farmer a "thief" and said he was "greedy." He threatened to call the police and sue Farmer. Farmer thought Hawker came on "too strong." Hawker also contacted Roohparvar and demanded that SVC pay all or part of the $1,000 reward.

Roohparvar sent Farmer a copy of an e-mail he received from Hawker, in which Hawker stated that Farmer was holding the Boards "hostage" and that QuickSilver had no choice but to pay the reward "to get the boards back in any kind of functioning order." Roohparvar apologized to Farmer for having to "deal with these unusual circumstances," offered to refund what Farmer had paid and offered a $75 gift certificate for SVC products. Roohparvar asked Farmer to return the Boards to SVC and promised to immediately "return [them] to their legitimate owner." Alternatively, he suggested Farmer return the Boards to Hawker.

Farmer was offended at Hawker's suggestions that he was holding the Boards hostage and would damage the Boards. It was not in his nature to

"harm something as beautiful as those boards." Farmer became suspicious of Hawker and sent an e-mail to QuickSilver executives.

### D. *Defendant Gets Involved*

About this time, Roohparvar asked defendant, his longtime friend, to assist him with the matter since Roohparvar was going to Iran for an extended period of time. Defendant was semiretired. He had developed an interest in the law and assisted people in the Iranian-American community with conflict resolution, using the name "Alternative Dispute Resolution Advocates." Defendant is not a lawyer.

Roohparvar introduced defendant to Farmer as his "advocate" and said defendant would help Farmer get the Boards back to QuickSilver. Defendant told Farmer that he had "assigned an investigator to look into this matter" and asked Farmer to provide him with information regarding his contacts with Hawker.

Farmer sent the Boards back to SVC. At the time, he expected a refund and a gift certificate and was hoping for a reward. He thought defendant was an attorney and would represent his interests.

A few days later, Bryan Wang, the director of finance at QuickSilver contacted Farmer. Farmer told Wang he had returned the Boards to SVC and referred him to Roohparvar, who referred him to defendant. Roohparvar told Wang that defendant would return the Boards.

Wang spoke with defendant by phone on September 3, 2004. Defendant told Wang he was not going to return the Boards because he needed to determine whether they actually belonged to QuickSilver. Wang offered to provide whatever documentation defendant required. Defendant asked whether QuickSilver had filed an insurance claim and been paid on the claim. QuickSilver had insured the shipment and TNT's insurer (the Insurer) paid the claim.[1] Wang told defendant that QuickSilver had received $24,000 from the Insurer, which was the amount it cost QuickSilver to build the Boards. In response defendant said that QuickSilver no longer owned the Boards and that they belonged to the Insurer.

Defendant then told Wang that it would be beneficial for QuickSilver to buy the Boards from him rather than offer a reward. He said if QuickSilver offered a reward, it would owe the Insurer for the claim that was paid, but if QuickSilver purchased the Boards from SVC, it would not have to tell the

---

[1] The record does not identify the insurance company that paid the claim.

Insurer anything. Defendant offered to sell the Boards to QuickSilver for $10,000.[2] Wang told defendant that he was not interested because he considered it a property recovery either way. Wang said he was surprised at defendant's response, because Roohparvar had said defendant would return the Boards to QuickSilver. Defendant responded, "[T]hat was before we knew we were sitting on a gold mine." Wang was "shocked" and told defendant that if his objective was to gain financially for the lost or stolen Boards, it was despicable and not in accordance with business norms. Wang did not give defendant any contact information for the Insurer because he thought defendant would try to extract money from the Insurer after he was unsuccessful getting it from QuickSilver.

On September 7, 2004, defendant sent Wang an e-mail summarizing their telephone conversation. Defendant acknowledged that Wang did not agree with his $10,000 demand and stated "but you did not counter the offer. If there is any counter offer, I would be more than happy to discuss it with my client and Mr. Farmer."

### E. QuickSilver Retains Counsel and Counsel's Efforts to Get the Boards

QuickSilver retained legal counsel, Sarah Zimmerman of Wilson, Sonsini, Goodrich and Rosati. Zimmerman responded to defendant's e-mail by letter on September 9, 2004. She told defendant that QuickSilver "is willing to provide a reward of $1,000 when both boards are returned intact. QuickSilver will then take the appropriate steps to notify its insurer of the recovered property." Zimmerman asked defendant to return the Boards by September 20, 2004. She provided documentation related to the shipment of the Boards and their loss in transit, including TNT's shipping invoice and e-mails from Eagle Global.

Defendant responded by e-mail on September 15, 2004. Defendant challenged the factual assertions in Zimmerman's letter and stated "[i]t is easy to conclude that your client has no interest to share with us" the settlement it had received from the Insurer. Defendant told Zimmerman that SVC was willing to relinquish the Boards to QuickSilver's insurer for $200 (the $150 it had paid Farmer plus $50 for overnight shipping) on the following conditions: (1) that QuickSilver disclose to SVC "all information" about the insurance companies that had paid for the loss; (2) that Wang provide SVC a sworn statement declaring the amount QuickSilver had received for the Boards "from all sources"; (3) that Eagle Global provide SVC with a sworn

---

[2] According to Wang, defendant said he wanted $20,000 for the Boards; but Wang figured he would take $10,000. According to defendant, he demanded $10,000 for the Boards.

statement of the facts surrounding the loss and the identity of any third parties that paid the loss; and (4) that QuickSilver and Eagle Global authorize SVC or its representative to contact the Insurer or any third party that paid for the loss. Alternatively, defendant stated that SVC was willing to sell the Boards to QuickSilver for $8,000. Zimmerman testified that defendant never made a firm offer and that his demands were "shifting sands."

Zimmerman responded on September 23, 2004, and stated, "If SVC purchased the boards, it did so from someone who had a duty to return the boards to QuickSilver under Civil Code § 2080. Any subsequent sale of the boards constitutes theft under California Penal Code § 485. SVC, if it purchased the boards, purchased stolen property. SVC may not seek to profit from its possession, but instead must return the boards to the rightful owner or turn them directly over to the local police authorities." Zimmerman said QuickSilver's ownership interest in the Boards had not changed due to its acceptance of an insurance payment and suggested that if SVC had doubts about whether to return the Boards to QuickSilver or the Insurer, then it should turn them over to the police. Zimmerman stated that QuickSilver remained willing to provide a $1,000 reward, but only if the Boards were returned by October 1, 2004.

On October 14, 2004, defendant sent Zimmerman an e-mail stating that he was concerned that QuickSilver would not contact the Insurer and asked whether QuickSilver would agree to "a three-way meeting or conference call with the carrier."

Zimmerman responded on October 18, 2004, stating "QuickSilver will meet all of its contractual obligations to its 'carrier(s),' however this is not your concern. QuickSilver will not facilitate your efforts at wrongful pecuniary gain from its 'carrier(s).' " Zimmerman told defendant that he could either turn the Boards over to the police or return them to QuickSilver. She offered to pay the $1,000 reward if defendant returned the Boards by October 28, 2004, and to provide defendant with a copy of the notice of returned property that QuickSilver would send to the Insurer.

Zimmerman spoke with defendant by phone on November 1, 2004. Defendant said he would return the Boards to the Insurer immediately without asking for any compensation. Zimmerman asked defendant to confirm that offer in writing. Defendant responded by e-mail, stating that QuickSilver "will not be allowed to enjoy a monetary gain of at least $48,000 (the value of the two boards in their own admission)" by paying only $1,000. He stated that it was not "palatable" for him "to facilitate a $47,000 windfall profit" for QuickSilver and that unless QuickSilver was willing to be reasonable, he would rather give the Boards to the Insurer and lose $200. He

said that he would give the Boards to the Insurer as soon as he was able to talk to the adjuster, that if QuickSilver was "still interested to enjoy a windfall profit," it had to be reasonable, and that his "ears [were] open . . . to a better offer."

Zimmerman sent defendant an e-mail stating that his response was "confusing and ambiguous." She asked him for a plain statement that he would return the Boards to the Insurer without compensation. Defendant responded that he would return the Boards to the Insurer as soon as QuickSilver provided him with contact information for the adjuster and he had an opportunity to talk to the adjuster.

On November 2, 2004, Zimmerman asked Tracy Tosh-Lane, an attorney at her firm, for help. Tosh-Lane called defendant. Defendant said he was not returning the Boards without conditions attached, that he was concerned that QuickSilver would keep the insurance money and the Boards, that he wanted some way to protect the Insurer, and that he was not going to give the Boards back unless that happened. Tosh-Lane did not think that was appropriate and told defendant that they would not continue to negotiate the return of the Boards and that if they were not returned within 24 hours, they would turn the matter over to the police. Defendant stated that if the Insurer contacted him for return of the Boards, he would hand them over without requesting compensation.

In early November 2004, QuickSilver contacted the police and notified the Insurer that defendant had the Boards. Almost two years later, San Jose police searched defendant's home and recovered the Boards.

## II. *Defense Case*

Defendant testified. Roohparvar told him the Boards were stolen when Roohparvar first contacted him. Hawker told Farmer the Boards were worth $24,000 each. Defendant told Farmer to send the Boards back to SVC and that they would try to get some reward money for him. After Farmer returned the Boards to SVC, Roohparvar brought them to defendant's house. Defendant never opened the box and never used the Boards. Defendant testified that the money he demanded was not for Roohparvar. Roohparvar had told him that he could keep whatever he could get for the Boards.

Initially, defendant thought about taking the Boards to the police. But he figured QuickSilver would just pick them up and the Insurer would never learn that they had been recovered. After he got QuickSilver's last letter, he assumed he was never going to get the insurance contact information and called the San Jose police, who referred him to the sheriff's office. He called

the sheriff's office and as soon as he mentioned Civil Code section 2080 (duties of a finder), they said they did not handle civil cases.

Defendant suspected that QuickSilver had been paid twice for the lost Boards, once by TNT's insurer and once by QuickSilver's insurer. He believed that once QuickSilver received the insurance money, it no longer owned the Boards. Defendant told the jury he had "decided . . . to set these people up to see if they're going to do insurance fraud." Defendant believed Zimmerman was helping QuickSilver commit insurance fraud. He stated that it was "getting better every day. So I'm just going to continue this until . . . , they would take the bite and . . . buy this thing back for substantial sums, so I can, basically, file a claim with the department of insurance." He did not believe Zimmerman when she told him QuickSilver would notify the Insurer once the Boards were returned. He did not trust the police, either. Defendant did not tell the police he was trying to set QuickSilver up for insurance fraud and when he testified at the preliminary hearing, he did not tell the court he suspected insurance fraud. Defendant thought he would be committing a crime (insurance fraud) if he gave the Boards back to QuickSilver. If QuickSilver had given him the money, he would have taken the check and the correspondence to the Department of Insurance. Although he suspected insurance fraud, defendant never sought any legal advice.

## DISCUSSION

### I. Failure to Instruct on Specific Intent

Defendant contends that the trial court erred when it failed to instruct the jury that the charged offense (appropriation of lost property; Pen. Code, § 485)[3] requires a specific intent to permanently deprive the owner of the property. Defendant argues that because the jury instructions omitted an essential element of the offense (specific intent), they deprived him of a jury determination of guilt on every element of the offense and thereby violated his rights under the United States Constitution. He asserts that since the issue of his intent was highly contested, the error must be deemed prejudicial and his conviction must be reversed.

#### A. Instructions Given

The court instructed the jury with CALCRIM No. 250 regarding general criminal intent as follows: "The crime charged in this case requires proof of the union, or joint operation, of act and wrongful intent. [¶] In order to be guilty of the crime of Appropriation of Lost Property, a person must not only

---

[3] Further statutory references are to the Penal Code, unless otherwise stated.

commit the prohibited act, but must do so intentionally or on purpose. The act required is explained in the instructions for the crime. However, it is not required that he or she intend to break the law."

Since there is no pattern instruction for appropriation of lost property, the court instructed the jury in the language of section 485 as follows: "Let me now define for you the crime of Appropriation of Property. [¶] Anyone who finds lost property under circumstances which give him or her knowledge of or means of inquiry as to the true owner, and who appropriates such property to his or her own use, or to the use of another person not entitled thereto, without making reasonable and just efforts to find the owner and restore the property to the owner, is guilty of the crime of Appropriation of Property. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. Defendant found lost property under circumstances which give him either the knowledge of the true owner or means to find the true owner; [¶] AND [¶] 2. Defendant appropriated that property to his use or the use of another person without first making reasonable and just efforts to find the true owner and return the property to him or her."

Defendant contends the trial court erred when it instructed the jury that appropriation of lost property is a general intent crime and when it failed to instruct the jury that appropriation of lost property requires a specific intent to permanently deprive the owner of the property.

## B. *Standard of Review*

Errors in jury instructions are questions of law, which the appellate court reviews de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569 [76 Cal.Rptr.2d 239, 957 P.2d 928].)

## C. *Analysis*

The first step in addressing defendant's contentions is to determine whether appropriation of lost property is a specific intent or a general intent crime. This is an issue of first impression.

Our Supreme Court has noted the difficulty in categorizing a crime as requiring a general or a specific intent in *People v. Rathert* (2000) 24 Cal.4th 200, 205 [99 Cal.Rptr.2d 779, 6 P.3d 700]. The *Rathert* court repeated the standard formulation that the definition of a general intent crime consists of the description of an act, while a specific intent crime describes a reference to intent to do a further act or achieve a future consequence. The court also stated that it is not necessary to attempt to fit an offense into the specific or

general intent category unless a mental state defense is raised. (*Ibid.*) In this case, defendant's intent was one of the primary issues in the case.

Section 485 is found in part 1 ("Of Crimes and Punishments"), title 13 ("Of Crimes Against Property"), chapter 5 ("Larceny") of the Penal Code. The statutes in chapter 5 address various forms of theft, larceny, and embezzlement. They set forth the elements of the offenses, the degrees of the crimes and punishment. In 1927, the formerly distinct property offenses of larceny, embezzlement, and obtaining property by false pretenses were consolidated into the single crime of "theft" defined by section 484. (*People v. Davis* (1998) 19 Cal.4th 301, 304 [79 Cal.Rptr.2d 295, 965 P.2d 1165] (*Davis*).) The change abolished most of the procedural differences between those offenses, but not their substantive distinctions. (*Ibid.*) "Since that time, any statutory reference to 'larceny' is read as if it were the word 'theft.'" (*People v. Avery* (2002) 27 Cal.4th 49, 53, fn. 4 [115 Cal.Rptr.2d 403, 38 P.3d 1] (*Avery*), citing § 490a.) Accordingly, I will sometimes use the word "theft" rather than "larceny."

Section 484, which defines the crime of theft generally, provides in part: "(a) Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another . . . is guilty of theft." The intent to steal is an element of the offense. (*Davis, supra,* 19 Cal.4th at p. 305.) The intent element necessary to establish the crime of theft is generally described as the specific "intent to *permanently* deprive the owner of possession of the property." (*Avery, supra,* 27 Cal.4th at p. 54; see *People v. Shannon* (1998) 66 Cal.App.4th 649 [78 Cal.Rptr.2d 177].)

In *Avery*, while examining the intent requirement in section 484, our state Supreme Court explained that California's theft statute "does not itself expressly require an intent to permanently deprive. Rather, it merely says that, to be guilty of theft, the person must 'feloniously steal' the property; it does not further define the intent requirement." (*Avery, supra,* 27 Cal.4th at p. 55.) Although the statute is silent on the intent required to commit theft, "the 'statute is declaratory of the common law' and so includes the common law intent requirement" (*ibid.,* quoting *Davis, supra,* 19 Cal.4th at p. 304, fn. 1), which, as noted before, is generally described as "the intent to *permanently* deprive the owner of possession of the property" (*Avery, supra,* 27 Cal.4th at p. 54). The common law "reference to the intent to permanently deprive is merely a shorthand way of describing the common law requirement and is not intended literally." (*Avery,* at p. 55.)

Section 485, which sets forth the offense of appropriation of lost property, provides: "One who finds lost property under circumstances which give him knowledge of or means of inquiry as to the true owner, and who appropriates

such property to his own use, or to the use of another person not entitled thereto, without first making reasonable and just efforts to find the owner and to restore the property to him, is guilty of theft." Section 485 expressly states that a person who appropriates lost property under the circumstances set forth in the statute is "guilty of theft" and the case law cited above instructs that theft is a specific intent crime.

No case has interpreted section 485 as including the same intent element as section 484, but no case has described it as a general intent crime either.

Relying primarily on *People v. Buelna* (1889) 81 Cal. 135 [22 P. 396] (*Buelna*), defendant argues that appropriation of lost property is a theft crime and that it requires the same intent as the theft offenses in section 484, namely the specific intent to permanently deprive the owner of the property. The defendant in *Buelna* was convicted of grand larceny under section 484, for the theft of a stray steer. Disputed factual issues in *Buelna* included whether the defendant stole the steer or found it and who actually owned the steer. The prosecution presented evidence that the defendant took the steer from the owner's possession with the intention to deprive the owner of his property. The defense was that the defendant found the steer and intended to find the owner and restore the property to him. In light of that defense, the trial court instructed the jury in the language of both section 484, the general larceny statute, and section 485, appropriation of lost property. The defendant argued that the trial court erred by instructing the jury with section 485 since the acts described in section 485 constituted a different kind of larceny from that set forth in section 484, the charged offense. The Supreme Court found no error since the facts supported giving the instruction. Commenting on the nature of section 485, the court stated: "It will be seen at a glance that it was not the legislative intent to create, by the enactment of these provisions of law, any two distinct kinds of larceny . . . . The first section defines larceny generally; the second section declares a rule of evidence which, being fulfilled, constitutes the crime as defined in the first section." (*Buelna*, at p. 137.) Thus, section 485 is a special theft statute, which sets forth a specific type of theft.

In *Davis*, the court discussed another "special theft statute," section 484.1. (*Davis, supra*, 19 Cal.4th at p. 318; *id.* at pp. 319–320.) Subdivision (a) of section 484.1, enacted in 1988, provides that "Any person who knowingly gives false information or provides false verification as to the person's true identity or as to the person's ownership interest in property or the person's authority to sell property in order to receive money or other valuable consideration from a pawnbroker or secondhand dealer and who receives money or other valuable consideration from the pawnbroker or secondhand dealer is guilty of theft." (See *Davis*, at pp. 318–319.) The court explained

that while there was some overlap of coverage between section 484 and section 484.1, the Legislature had two reasons for enacting a "special theft statute" that applied "the prohibition of section 484 to pawnbrokers and secondhand dealers." (19 Cal.4th at p. 319.) First, pawnbrokers and secondhand dealers would like to post section 484.1 " 'in a conspicuous place in their shops to discourage the presentation of false identification and representations and to justify to their customers their intense concern for correct identification and representations.' " (19 Cal.4th at p. 319.) Second, when stolen property that has been pawned or sold is recovered, it is returned to its true owner, not to the pawnbroker or secondhand dealer who purchased the property or loaned money on the property. To remedy that loss, section 484.1 provides that upon conviction the court may order the defendant to " 'make restitution to the pawnbroker or secondhand dealer in an amount not exceeding the actual losses sustained . . . .' " (19 Cal.4th at p. 319, quoting § 484.1, subd. (b).) Like section 485, section 484.1, which our state Supreme Court has characterized as a "special theft statute," provides that one who meets certain statutory criteria "is guilty of theft." (§ 484.1, subd. (a).)

Further examination of the intent requirement in section 484 is instructive in determining whether section 485 (appropriation of lost property) has the same intent requirement as section 484 (the general theft statute). "[T]he general rule is that the intent to steal required for conviction of larceny is an intent to deprive the owner *permanently* of possession of the property. [Citations.] For example, . . . it would not be larceny for a youth to take and hide another's bicycle to 'get even' for being teased, if he intends to return it the following day. [Citation.] But the general rule is not inflexible: 'The word "permanently," as used here is not to be taken literally.' " (*Davis, supra*, 19 Cal.4th at p. 307.)

To "determine the exact nature of California's intent requirement," the *Avery* court turned to the common law and the discussion in *Davis* of the "various factual circumstances involving arguably temporary takings that courts and commentators have found constitute theft." (*Avery, supra*, 27 Cal.4th at p. 55.) In *Davis*, the court had "discerned 'three relevant categories of cases holding that the requisite intent to steal may be found even though the defendant's primary purpose in taking the property is not to deprive the owner permanently of possession: i.e., (1) when the defendant intends to "sell" the property back to its owner, (2) when the defendant intends to claim a reward for "finding" the property, and (3) when . . . the defendant intends to return the property to its owner for a "refund." ' " (*Ibid.*, quoting *Davis, supra*, 19 Cal.4th at p. 307.)

The *Davis* court "also noted that '[o]ther categories of cases of temporary taking amounting to larceny have also been recognized. Thus the commentators agree there is an intent to steal when the *nature* of the property is such

that even a temporary taking will deprive the owner of its primary economic value, e.g., when the property is dated material or perishable in nature or good for only seasonal use. (E.g., [citation] [taking cut flowers from a florist without consent, with intent to return them in a week]; [citation] [taking a neighbor's lawn mower without consent for the summer, with intent to return it in the fall].) Another such category is composed of cases in which the defendant takes property with intent to use it temporarily and then to abandon it in circumstances making it unlikely the owner will recover it.' " (*Avery, supra*, 27 Cal.4th at p. 56, italics omitted, quoting *Davis, supra*, 19 Cal.4th at p. 307, fn. 4.) Based on its review of this and other authority, the court held that "the language in section 484, subdivision (a), referring to an intent to 'feloniously steal,' reasonably construed, adopted the common law intent requirement. That requirement, although often summarized as the intent to deprive another of the property permanently, is satisfied by the intent to deprive temporarily but for an unreasonable time so as to deprive the person of a major portion of its value or enjoyment." (*Avery*, at p. 58.)

In light of this authority, I agree with defendant's contention that appropriating lost property is a specific intent crime. I conclude further that the nature of the specific intent required for appropriation of lost property is defined in the language of section 485.

Viewing section 485 as "a rule of evidence," as characterized by the Supreme Court in *Buelna*, reveals that it describes a state of facts which, when proven, establish theft as it is defined in section 484. (*Buelna, supra*, 81 Cal. at p. 137.) Section 485 does not allow conviction for the mere act of finding lost property and keeping it. As I read section 485, it requires knowledge (or means of inquiry) of the true owner of found property. The statute also requires its own element of intent: to appropriate property for one's own use (or the use of another not entitled to the property) "without first making reasonable and just efforts to find the owner and to restore the property" to the owner. (§ 485.) Reading sections 484 and 485 together, in light of the relevant case law, I believe that appropriating found property under the circumstances set out in section 485 implies the intent to permanently deprive the owner of the property and constitutes theft. One who keeps another's property for his or her own use is permanently depriving the owner of its use and benefit. In my view, the intent requirement expressly set forth in section 485 is the functional equivalent of the common law specific intent requirement implied in section 484.

For these reasons, I conclude it was error not to instruct explicitly on specific intent as stated in CALCRIM No. 251[4] and that the court erred when it gave the general intent instruction in CALCRIM No. 250.

### D. *Prejudice*

The trial court's error in failing to instruct on specific intent is harmless beyond a reasonable doubt, in that it could not have misled the jury in light of the facts of the case and the court's instruction with the language of section 485. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Brenner* (1992) 5 Cal.App.4th 335, 339 [7 Cal.Rptr.2d 260] [applying *Chapman* where the court failed to instruct on specific intent].)

The court instructed the jury with CALCRIM No. 250, the general intent instruction, which referred the jury to the instruction on the appropriation of lost property. As noted before, that instruction was followed by an instruction that was based on the language of section 485, which instructed the jury that the offense is committed by finding lost property with knowledge of or means to identify the true owner and appropriating the property for one's own use without first making a reasonable effort to find the owner and restore the property to the owner.

In determining whether this was sufficient to instruct the jury on the specific intent required for appropriation of lost property, I return to the discussion of specific intent to commit theft in *Avery* and *Davis*. As noted before, the specific intent to permanently deprive the true owner of the property is "a shorthand way of describing the common law [intent] requirement and is not intended literally." (*Avery, supra*, 27 Cal.4th at p. 55.) The intent requirement is satisfied by the intent to "deprive temporarily but for an unreasonable time so as to deprive the [owner] of a major portion of [the property's] value or enjoyment." (*Id.* at p. 58.)

In *Davis*, the court examined common law cases that discussed the intent to steal in three circumstances that arguably involved temporary takings, two

---

[4] CALCRIM No. 251 provides in relevant part: "The crime . . . charged in this case require[s] the proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crime (in this case . . .), that person must not only intentionally commit the prohibited act . . . , but must do so with a specific (intent / [and/or] mental state). The act and the specific mental state required are explained in the instruction for that crime . . . . [¶] [The specific (intent / [and/or] mental state) required for the crime of _____ <insert name of alleged offense[s] e.g. burglary> is _____ <insert specific intent>.]" The final paragraph of CALCRIM No. 251 is optional but helpful in cases involving multiple counts. (Judicial Council of Cal., Crim. Jury Instns. (2009–2010) Bench Notes to CALCRIM No. 251, pp. 70–71.)

of which are relevant here: (1) when the defendant sells the property back to the owner and (2) when the defendant claims a reward for finding the property.

In reviewing the " 'sale' cases" the *Davis* court discussed *Regina v. Hall* (1848) 169 Eng.Rep. 291, the "classic case" involving the sale of property to its rightful owner. (*Davis, supra*, 19 Cal.4th at p. 308, italics omitted.) The defendant in *Hall*, an employee of a man who made candles, took some tallow from his employer and offered to sell it back to the employer. The jurors were instructed that if they found the defendant took his employer's property with the intent to sell it back to him as if it belonged to another and appropriate the proceeds, he was guilty of larceny. On appeal, the defendant argued that his assertion of temporary ownership of the property for a particular purpose was not enough to constitute the required intent to permanently deprive. (*Ibid.*) "The justices expressed two rationales for holding to the contrary. First, one justice stressed that the deprivation would in fact have been permanent unless the owner had agreed . . . '. . . to buy back what was in truth his own property.' [Citation.] [¶] The second rationale was that the defendant's claim of the right to sell the property was an assertion of a *right of ownership* and therefore evidence of an intent to permanently deprive: . . . 'What better proof can there be of such intent, than the assertion of such a right of ownership by the [defendant] as to entitle him to sell it.' " (*Ibid.*) A third "rationale for the rule that a defendant who takes property for the purpose of 'selling' it back to its owner has the requisite intent to permanently deprive" is that "by so doing the defendant creates a *substantial risk of permanent loss*, because if the owner does not buy back his property the defendant will have a powerful incentive to keep it in order to conceal the theft." (*Id.* at p. 309, citing Perkins & Boyce, Criminal Law (3d ed. 1982) p. 329 (Perkins).)

The *Davis* court observed that more than one rationale was offered in the " 'reward' cases" for finding the requisite intent to permanently deprive. (*Davis, supra*, 19 Cal.4th at p. 309, italics omitted.) One rationale is exemplified by *Commonwealth v. Mason* (1870) 105 Mass. 163, where the court reasoned that "the requisite felonious intent was shown because the defendant intended to deprive the owner of 'a portion of the value of the property.' [Citation.] The court did not explain this theory further, but later cases suggested that the 'portion of the value' in question was the right to claim a reward—ordinarily less than the property's full value—for its return." (*Davis*, at p. 309.) A second rationale is exemplified by *Slaughter v. State* (1901) 113 Ga. 284 [38 S.E. 854, 855], where the court stated: " 'It is not necessary to constitute larceny, that the property should be itself permanently appropriated. It is sufficient if the property be taken and carried away with the intent to appropriate any pecuniary right or interest therein, as where it is taken with the expectation of claiming a reward for its return.' " (*Davis*, at

p. 310.) A third line of cases "emphasize[s] a different rationale, i.e., that the taker had made the return of the property *contingent* on the offer of a satisfactory reward, and if the contingency did not materialize the taker would keep the property." (*Id.* at p. 310, citing *Berry v. State* (1877) 31 Ohio St. 219.) Finally, as with the sale cases, a taking with intent to hold for reward creates a substantial risk of permanent loss because " 'the intent will result in a permanent loss to the owner if he fails to offer or give a reward for the return of the property' " and "even the offer or payment of a reward may not eliminate the risk because the defendant still has an incentive to keep the property rather than expose himself to detection by returning it." (*Davis*, at pp. 312–313, citing Perkins, *supra*, at p. 330.)[5]

The instruction in this case, which used the language of section 485 and told the jury that to prove that defendant is guilty of the offense the People must prove that "Defendant appropriated the property to his use or the use of another person without first making reasonable and just efforts to find the true owner and return the property to him or her," was sufficient to state the common law intent element. The intent necessary to establish a violation of section 485 was contained within the instruction on the substantive elements of the crime. In my view, this language was the functional equivalent of instructing the jury that the defendant must either intend to deprive the owner permanently or intend to deprive the owner of a major portion of the property's value or enjoyment. (*Avery, supra,* 27 Cal.4th at pp. 57–58.) The instruction in this case could not have misled the jury into convicting defendant merely because he possessed the Boards. Under the instructions given, the jury must necessarily have decided the defendant had the requisite intent to deprive QuickSilver of the Boards permanently or for so extended a period that it deprived QuickSilver of a major portion of the Boards' value or enjoyment.

The facts here support my conclusion that any error in failing to instruct the jury with CALCRIM No. 251 on specific intent was harmless. There was a strong inference of an intent to permanently deprive, since defendant kept the Boards for almost two years after QuickSilver refused to purchase them from him or pay him a reward. During that time he made no further efforts to contact QuickSilver or the police. In addition, although defendant claimed the Insurer was the true owner of the Boards, there was no evidence that defendant ever attempted to contact TNT to determine the identity of the Insurer. Zimmerman had provided defendant with a copy of TNT's shipping invoice, which contained information about the shipper and the shipment, as well as contact information for Eagle Global personnel who were familiar

---

[5] The factual similarities between the manner in which defendant appropriated the property here and the temporary takings described above also bolster my conclusion that the offense in section 485 is a specific intent crime.

with the lost shipment. In view of this strong evidence and the instruction with the language of section 485, any error in failing to instruct with CALCRIM No. 251 was harmless beyond a reasonable doubt.

Even though I conclude that the instructions given here were sufficient and the instructional error in this case was harmless, defendant's challenge to the instruction could have been avoided if the court had also instructed the jury with CALCRIM No. 1800, the general instruction on theft under section 484, in addition to the language of section 485. As section 485 and *Buelna* instruct, appropriation of lost property is one form of theft.

Defendant argues that "[t]he prejudice stemming from the trial court's error is further demonstrated by the fact that the jury asked a question directly on point after being instructed that the charged offense required general criminal intent." During trial, the court permitted the jurors to ask questions of the witnesses. After the court had instructed the jury, but before argument, one of the jurors asked "[W]here it's talking about in order to be guilty of the crime he has to not only commit the act but must do so intentionally or on purpose. The last sentence, it is not required that he . . . intend to break the law. That sounds almost contradictory, but not quite. I wonder if you can clarify." The court responded, "Let me give a simple example. If I am in a bar and I have a disagreement with the gentleman to my right over the San Jose Giants, and I decide he needs to be poked in the nose to teach him a lesson, I don't have to know that poking him in the nose is against the law. I just need to be doing what I'm doing on purpose. As long as I'm intentionally hitting him, even though I don't know it's against the law, that's what we are talking about when they talk about general intent." In my view, that a juror posed this question before argument or deliberations is not evidence that the jury was having difficulty deciding that defendant had the requisite criminal intent to appropriate lost property. Although the court framed its response in terms of general criminal intent, the general intent instruction referred the jury to the elements of the offense.

## II. *Failure to Instruct That Mistake of Fact Was a Complete Defense*

Defendant argues that the court committed two additional instructional errors "which separately and together significantly limited the jury's ability to" determine whether defendant had the intent required for conviction under section 485. Defendant contends the court erred when "(1) it failed to instruct the jury that an honest mistake of fact as to the ownership of the [Boards] would constitute a complete defense; and (2) it instructed the jury that a mistake as to the lawfulness of declining to return the [Boards] to QuickSilver was not a defense." Defendant contends that these errors denied him the opportunity to present a complete defense, thereby violating his right to due process.

The majority concludes that the trial court's failure to instruct on mistake of fact was not prejudicial error. Applying a different analysis, I find no error because defendant was not entitled to a mistake of fact instruction.

## A. Background

During the jury instruction conference, defendant asked the court to instruct the jury with CALCRIM No. 3406,[6] the standard instruction on mistake of fact. Defendant argued that there were two mistakes of fact: (1) his "belief that returning the boards to QuickSilver would be a violation of law";[7] and (2) "a mistake as to who the true owner of the boards" was.

The court stated that "those sounded a whole lot like mistakes of law rather than mistakes of fact because . . . in this particular situation the ownership is a matter of law. And whether or not a particular action violates a law is, in my view, almost always going to be a legal matter rather than a factual matter."

Defendant argued that this case was similar to *People v. Russell* (2006) 144 Cal.App.4th 1415 [51 Cal.Rptr.3d 263] (*Russell*), a case in which this court reversed a conviction for receiving stolen property because the trial court failed to instruct on the defense of mistake of fact, where the defendant testified that he believed in good faith that the motorcycle he found was abandoned, not stolen, and where there was evidence that supported an inference of abandonment. Defense counsel argued that this case was similar to *Russell* because defendant believed in good faith that the Boards did not belong to QuickSilver anymore and that they belonged to the insurance company. The court distinguished this case from *Russell*, stating that there

---

[6] CALCRIM No. 3406 provides: "The defendant is not guilty of ___ <*insert crime[s]*> if (he/she) did not have the intent or mental state required to commit the crime because (he/she) [reasonably] did not know a fact or [reasonably and] mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as (he/she) [reasonably] believed them to be, (he/she) did not commit ___ <*insert crime[s]*>. [¶] If you find that the defendant believed that ___ <*insert alleged mistaken fact[s]*> [and if you find that belief was reasonable], (he/she) did not have the specific intent or mental state required for ___ <*insert crime[s]*>. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for ___ <*insert crime[s]*>, you must find (him/her) not guilty of (that crime/those crimes)." The bench notes state: "If the defendant is charged with a general intent crime, the trial court must instruct with the bracketed language requiring that defendant's belief be both actual and reasonable. [¶] If the mental state element at issue is either specific criminal intent or knowledge, do not use the bracketed language requiring the belief to be reasonable." (Judicial Council of Cal., Crim. Jury Instns. (2009–2010) Bench Notes to CALCRIM No. 3406, p. 1011, citing *People v. Reyes* (1997) 52 Cal.App.4th 975, 984 & fn. 6 [61 Cal.Rptr.2d 39].)

[7] Since defendant does not rely on this alleged mistake of fact on appeal, I shall not address it further.

was no suggestion that defendant thought he was entitled to the Boards and that in its view a violation of section 485 was a general intent crime and that the mistake of fact defense did not apply.

The prosecution argued that mistake of fact did not apply because defendant's decision to withhold the Boards from QuickSilver was not based on any specific facts, but on "defendant's claimed misinterpretation of insurance law" and that it was "clearly a mistake of law case." The court did not believe there was substantial evidence of a mistake of fact and denied defendant's request to instruct on mistake of fact.

### B. *Legal Principles*

The trial court must instruct on general principles of law relevant to the issues raised by the evidence. (*People v. Beardslee* (1991) 53 Cal.3d 68, 87 [279 Cal.Rptr. 276, 806 P.2d 1311].) " 'The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " (*People v. Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds in *People v. Breverman* (1998) 19 Cal.4th 142, 149 [77 Cal.Rptr.2d 870, 960 P.2d 1094] & *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) The trial court must instruct on a defense that is supported by substantial evidence if the defendant is relying on that defense *or* the defense is not inconsistent with the defense theory of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903]; *Flannel*, at p. 684.) In assessing the evidence to determine whether to give a requested instruction, the trial court should not measure the substantiality of the evidence by weighing the credibility of the witnesses. That duty is within the exclusive province of the jury. However, if the evidence is minimal and insubstantial, then the court need not instruct on its effect. (*Flannel*, at p. 684.)

Class Three of section 26 includes among persons incapable of committing a crime, "Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent."

Defendant does not cite any cases that apply the mistake of fact defense to appropriation of lost property (§ 485). However, there are not many California cases discussing section 485. (See cases collected in 48A West's Ann. Pen. Code (1999 ed.) foll. § 485.) The defense has been applied in cases involving other property offenses, including petty theft (*People v. Navarro* (1979) 99 Cal.App.3d Supp. 1 [160 Cal.Rptr. 692] [defendant who took wood beams from construction site had mistaken, good faith belief they were abandoned]), attempted vehicle theft (*People v. Scott* (1983) 146

Cal.App.3d 823 [194 Cal.Rptr. 633] [defendant who attempted to take vehicle while delusional due to involuntary ingestion of a hallucinogen was acting under mistake of fact]), and receiving stolen property (*Russell, supra*, 144 Cal.App.4th 1415 [defendant believed in good faith that motorcycle he took was abandoned]). In cases involving specific intent crimes, such as theft, the law does not require that the defendant's mistaken belief be reasonable, although the fact that it is unreasonable may cause the jury to disbelieve the defendant's claim that he held it. (*Navarro*, at p. Supp. 10.)

A mistake of fact, by itself, is not a defense unless the mistake disproves an element of the crime. (*In re Jennings* (2004) 34 Cal.4th 254, 277 [17 Cal.Rptr.3d 645, 95 P.3d 906]; see *People v. Vineberg* (1981) 125 Cal.App.3d 127, 135 [177 Cal.Rptr. 819] [defendants, bailees of stored silver, sold it in speculative transactions under mistaken belief that they had enough silver on hand to cover bailors' claims; mistake was no defense because defendants had no right to sell the silver]; *People v. Parker* (1985) 175 Cal.App.3d 818 [223 Cal.Rptr. 284] [mistaken belief that burglarized building was not a residence was no defense; knowledge of residential character not required for first degree burglary].) When a person commits an act based on a mistake of fact, his guilt or innocence is determined as if the facts were as he perceived them. (*People v. Osborne* (1978) 77 Cal.App.3d 472, 479 [143 Cal.Rptr. 582].)

C. *Analysis*

In my view, defendant was not entitled to rely on a mistake of fact defense because his asserted mistake of fact did not disprove an element of appropriation of lost property. To be guilty of theft by appropriating lost property, defendant must have found the Boards under circumstances which gave him knowledge of or means of inquiry as to the true owner and must have appropriated the Boards to his own use, or to the use of another person not entitled thereto, without first making reasonable and just efforts to find the owner and to restore the property to him. (§ 485.) Shortly after he acquired the Boards, defendant was in contact with QuickSilver, the original owner and manufacturer of the Boards. After his first contact with Wang, defendant suspected that ownership of the Boards had transferred. Defendant attempted to learn the identity of the Insurer from QuickSilver, but made no efforts to independently investigate the Insurer's identity after Zimmerman gave him the name of the shipper, a copy of the shipping invoice, and an e-mail with contact information for persons at Eagle Global who were involved in tracking the lost shipment.

Moreover, in spite of his allegedly mistaken belief that the Insurer (and not QuickSilver) owned the Boards, defendant appropriated the Boards to his own use, by trying to sell them to QuickSilver or by using them in his plan to

uncover insurance fraud. The evidence discloses that in spite of his mistaken belief, defendant tried to sell the Boards to QuickSilver for $10,000 on September 3, 2004; asked for a counteroffer on September 7, 2004; asked for $8,000 on September 15, 2004; told Farmer he was working on getting more than the $1,000 reward on September 16, 2004; indicated that he was "open to hear a better offer" from QuickSilver on November 1, 2004; and continued to pursue the $1,000 reward the entire time. Thus, even if defendant mistakenly believed the Boards belonged to the Insurer, his mistake of fact did not disprove any of the elements of the offense.

For these reasons, I conclude defendant was not entitled to a mistake of fact instruction and the court did not err in refusing to instruct on mistake of fact.

### III. *Propriety of Instructing on Mistake of Law*

Defendant argues that, assuming his mistake regarding the ownership of the Boards was a mistake of law, the court erred by failing to instruct the jury that a mistake of law may negate specific intent and by instructing the jury with CALCRIM No. 3407.

#### A. *Background*

Defendant objected to instructing the jury with CALCRIM No. 3407 on mistake of law. The court overruled the objection and instructed the jury with CALCRIM No. 3407 as follows: "It is not a defense to the crime of appropriation of property that the defendant did not know he was breaking the law or that he believed his act was lawful."

#### B. *Legal Principles and Analysis*

"In determining whether a defendant's mistaken belief disproves criminal intent, the courts have drawn a distinction between mistakes of fact and mistakes of law. (*People v. Snyder* (1982) 32 Cal.3d 590, 592–593 [186 Cal.Rptr. 485, 652 P.2d 42].) While a mistake of fact usually is a defense, a mistake of law usually is not. It is commonly said that ignorance of the law is no excuse. (*People v. Cole* (2007) 156 Cal.App.4th 452, 483 [67 Cal.Rptr.3d 526].) '[I]n the absence of specific language to the contrary, ignorance of a law is not a defense to a charge of its violation.' " (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1661 [82 Cal.Rptr.3d 100].)

However, mistake of law can be a valid defense when the crime requires specific intent if the mistake of law negates the intent or other mental state that is an element of the crime. (*People v. Cole, supra*, 156 Cal.App.4th at

p. 483.) For example, in a dispute between a buyer and a seller over title and the right to possess personal property, the buyer's taking of the property under the misconception that he has a legal right to the property is not theft because the intent to steal is lacking. (*People v. Photo* (1941) 45 Cal.App.2d 345, 353 [114 P.2d 71].) Here, defendant's asserted mistake of law relates to the identity of the true owner of the property and the mistaken belief that the Boards belonged to the Insurer. However, that mistaken belief does not negate the intent element in this case, since there was evidence that defendant appropriated the Boards to his own use when he tried to sell them to QuickSilver regardless of whether they belonged to QuickSilver or the Insurer. I therefore conclude defendant was not entitled to an instruction that mistake of law was a defense.

The Bench Notes state that the court should exercise caution when instructing the jury with CALCRIM No. 3407 in cases involving specific intent crimes and states "[a] mistaken belief about legal status or rights may be a defense to a specific intent crime if the mistake is held in good faith." (Bench Notes to CALCRIM No. 3407 (2009–2010 ed.) p. 1013, citing *People v. Vineberg, supra,* 125 Cal.App.3d at p. 137 & *People v. Stewart* (1976) 16 Cal.3d 133, 140 [127 Cal.Rptr. 117, 544 P.2d 1317].) The defendants in both *Vineberg* and *Stewart* believed they had a legal right or authorization to use the property at issue. This case is distinguishable. Here defendant asserts a mistake regarding the identity of the legal owner. He does not assert that he had a right to use the property.

Moreover, since CALCRIM No. 3407 merely instructed that ignorance of the law is no excuse, I perceive no prejudicial error in instructing the jury with CALCRIM No. 3407 in this case.

IV. *Ineffective Assistance of Counsel*

Defendant contends that his intent to return the Boards to the true owner could have been shown by evidence of a prior similar act of honesty, which was admissible under Evidence Code section 1101, and that his counsel was ineffective for failing to offer this theory of admissibility.

A. *Background*

As proof of defendant's character trait for honesty, defense counsel attempted to ask defendant about an incident in which defendant notified his bank that it had erroneously deposited $1,000 into his account. The prosecution objected and the court refused to admit the evidence stating that Evidence Code section 1102 "precludes evidence of specific acts of the defendant to prove character as circumstantial evidence of his innocence or of his disposition to commit the crime with which he is charged."

### B. *Legal Principles Regarding Ineffective Assistance of Counsel*

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." (*People v. Benavides* (2005) 35 Cal.4th 69, 92–93 [24 Cal.Rptr.3d 507, 105 P.3d 1099], citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 693–694 [80 L.Ed.2d 674, 104 S.Ct. 2052].)

" 'Tactical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, [the appellate court] will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." ' " (*People v. Hart* (1999) 20 Cal.4th 546, 623–624 [85 Cal.Rptr.2d 132, 976 P.2d 683].) " 'Finally, prejudice must be affirmatively proved; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*Id.* at p. 624.)

### C. *Analysis*

To determine whether trial counsel was ineffective in the circumstances presented here, I review the rules related to the admissibility of evidence of other similar acts under Evidence Code sections 1101 and 1102.

Evidence Code section 1101, subdivision (a) sets forth the general exclusionary rule. It provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." "This type of evidence sometimes is referred to as evidence of criminal disposition or propensity." (*People v. Carter* (2005) 36 Cal.4th 1114, 1147 [32 Cal.Rptr.3d 759, 117 P.3d 476] (*Carter*).)

"The rule excluding [evidence of criminal disposition or propensity] is qualified by Evidence Code section 1101, subdivision (b), which provides:

'Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as . . . opportunity, intent, preparation, plan, knowledge, identity . . .) other than his or her disposition to commit such an act.' " (*Carter, supra*, 36 Cal.4th at p. 1147.)

Evidence Code section 1102 provides in part: "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is: [¶] (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character." Section 1102 creates an exception to the exclusionary rule in Evidence Code section 1101, subdivision (a) "in criminal cases for evidence 'in the form of an opinion or . . . reputation,' but not specific instances of conduct." (*People v. Felix* (1999) 70 Cal.App.4th 426, 431 [82 Cal.Rptr.2d 701].) The trial court correctly excluded evidence of defendant's prior act of honesty involving the bank deposit under Evidence Code section 1102, since that evidence involved a specific instance of conduct.

Defendant contends that the evidence of the prior incident of honesty involving the bank deposit was admissible under Evidence Code section 1101, subdivision (b) to prove his lack of intent to appropriate property that does not belong to him and that his trial counsel was ineffective because he failed to argue this theory of admissibility.

Defendant does not cite any authority for the proposition that the exception stated in Evidence Code section 1101, subdivision (b) applies to evidence of prior good acts. Subdivision (b) expressly refers to "evidence that a person committed a crime, civil wrong, or other act" and our state Supreme Court has referred to the type of evidence covered by Evidence Code section 1101 as "evidence of criminal disposition or propensity." (*Carter, supra*, 36 Cal.4th at p. 1147.) The cases defendant cites involved uncharged acts of criminal conduct. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 390 [27 Cal.Rptr.2d 646, 867 P.2d 757] ["prior, uncharged misconduct"]; *People v. Smith* (1984) 155 Cal.App.3d 1103, 1194 [203 Cal.Rptr. 196] (conc. & dis. opn. of Work, J.) [evidence of "similar sham sales" to show common scheme and intent in embezzlement case], disapproved on other grounds in *Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 832–835 [50 Cal.Rptr.2d 101, 911 P.2d 1].) Since the evidence at issue does not involve uncharged criminal acts or civil wrongs or show a criminal disposition or propensity, it was not admissible under Evidence Code section 1101, subdivision (b). I therefore conclude that defense counsel was not ineffective for failing to advance this theory of admissibility in the trial court.

## V. *Cumulative Error*

Since I find no prejudicial error in this case, I also reject defendant's contention that the cumulative effect of the errors alleged in this case requires reversal.

For all these reasons, I agree that the judgment should be affirmed.