Filed 8/25/15  P. v. Staunton CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B253615 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA399634) |
| v. | |
| MICHAEL STAUNTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Paul T. Suzuki, Judge.  Affirmed.

Melanie K. Dorian for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Michael Staunton pleaded not guilty to the charges in an information against him. In count 1 he was charged with sexual battery by restraint (Pen. Code, § 2453.4, subd. (a)); in count 2, with assault by a public officer (Pen. Code, § 149); and in count 3, with false imprisonment by violence (Pen. Code, § 236). A jury found him guilty as charged. He was sentenced to four years in state prison, the upper term for count 1. The sentences for counts 2 and 3, the midterm of two years for each, were stayed. (Pen. Code, § 654.) Staunton appeals. (Pen. Code, § 1237.)

**Background**

Staunton worked as one of about 400 sworn peace officers of the Los Angeles Airport Police, at Los Angeles International Airport. Officer Howard Chambliss worked for the Airport Police as a security officer, not a sworn peace officer, and therefore did not carry a gun or have the power to arrest, as police officers did. Staunton and Chambliss were well acquainted as friends at work.

On April 12, 2011, Melissa W. was at the airport with Tracy Culp, waiting for their return flight to Washington. Coming to meet them at the boarding gate were a friend, Frankeice Jordan, and Jordan's young daughter Hazel, with whom they had been visiting in Los Angeles.

They sat on a bench past the security screening area, opposite a security podium, at which Melissa noticed Staunton and Chambliss, whom she believed to be "regular police officers" because of their uniforms, badges, and weapons. After his lunch, Chambliss had stopped at the podium to talk with Staunton on his way to a visit with another airport employee whom he had been dating. According to Chambliss, Melissa was dressed in a short and somewhat revealing white dress. Staunton noticed, and commented to Chambliss on Melissa's good looks and attractiveness.

Staunton, who had been staring at Melissa and Culp, called Melissa over to the security podium, apparently to sign something on his clipboard; but when she was there he said he "just wanted to see your sexy ass walk over here"—to which Melissa laughed nervously. Staunton and Melissa talked for a while, apparently friendly and with some

2

laughter.  As Melissa walked back from the podium to her seat, Staunton asked her to shake her ass, or said he wanted to see her ass jiggle.  Melissa walked back to her seat in a way that Chambliss thought was slow and sexy, shaking her behind (which Melissa denied).  Melissa told her friend she was offended and found the comment "creepy." Soon afterward Staunton walked over to Melissa and Culp, making a few jokes about how officers spend their time looking at pretty ladies—to which Melissa and Culp laughed, but felt very uncomfortable.  Chambliss left to meet his friend.  Because Staunton had been "creeping [them] out," Melissa and Culp went toward the food court, where they were soon joined by Jordan and Hazel.

After they went to their boarding gate, Melissa and her friends were approached by Staunton, who was talking into his walkie-talkie, saying "I found her."  He told Melissa in a very stern and official manner that "you need to come with me, Ma'am." Although she and Jordan initially thought she had no choice but to go with Staunton, he then "lightened up," saying she had been selected to have an airport tour.  Jordan told Hazel to go along with them (seeing that Melissa looked nervous and believing the child's presence would keep anything improper from happening), but Staunton sent her back, saying "no kids"—which made Melissa wonder "what's going on?"

Although she had felt very uncomfortable about their earlier conversation, Melissa went with Staunton without comment.  She did not feel she could decline, because he was a police officer.  Jordan told Culp (who then went to look for Melissa), but not wanting to overreact, she did not notify the police.

Staunton took Melissa through a number of areas of the airport restricted to the public (and to which Staunton was not authorized to bring anyone), including elevators activated by security badges, and areas within the view of security cameras.  After going through a basement storage room filled with boxes or crates, they entered an unused baggage claim area with suitcases, windows looking out toward the planes, and no cameras.  As they returned to the storage room, Staunton continued to tell Melissa how beautiful her legs were and to ask if she had a boyfriend; Melissa felt trapped and in physical danger, but did not know how or where to go.

3

Standing in front of the door as he continued to compliment Melissa's appearance, Staunton told Melissa to pull her dress up, saying he was "LAPD" and that she was subject to search at any time. Melissa complied, feeling intimidated. When she pulled her dress back down, Staunton came up behind her and pulled it back up. Melissa did not resist or tell Staunton to stop. Staunton put his hand between her thighs, pushing for her to open her legs, and rubbed her vagina with his fingers. Melissa was scared, believing she would be beaten, raped, or both. After about 20 seconds, she said "That's enough," and pulled her dress down.

At Staunton's request, Melissa gave him her phone number (believing he might check to see if it was fake). Staunton offered to take her back upstairs and to buy her food; she accepted in order to end the encounter. Melissa went back to her boarding gate, and Staunton returned to the security podium.

When Melissa approached Culp and Jordan after she had been gone for about 20 to 30 minutes, she was carrying some food, her hair was disheveled, she appeared dazed and "traumatized," and she was both laughing and crying. She told Culp and Jordan what had happened, saying she would not have gone with Staunton except that he was a police officer. Concerned that she would not be believed because he was a police officer, and saying she just wanted to go home, Melissa did not want to report the incident. But Jordan and Culp insisted, convincing her that she was probably not Staunton's first victim.

After being told by an airport ticked agent to find a police officer, and taking some measures to avoid Staunton, Melissa called the local police station and asked for a female officer. When Melissa was eventually able to meet with a female officer, she was uncomfortable with the officer's attitude and "standoffish" treatment of her and her friends. She described what had happened, but without saying Staunton had touched her vagina.

Back at the boarding gate, Melissa and her friends were approached by two male officers, one of whom was Staunton's supervisor. She was taken to a first-class lounge for a tape-recorded interview. She described the events, but did not mention some details

4

of the incident because she was scared and uncomfortable being interviewed by the condescending and somewhat disinterested male sergeants. The interview ended after about 10 minutes, because Melissa had to catch her flight.

After Melissa arrived home she received two phone messages from Staunton, which she did not answer. Melissa identified Staunton's photo about a week later as the officer who had harassed her and touched her vagina in the airport basement.

## Discussion

Staunton was convicted of sexual battery by restraint, assault by a public officer, and false imprisonment by violence. On appeal he contends that reversal of his conviction is required because his constitutional right to a meaningful defense and fair trial were denied by the trial court's failure to instruct the jury on the defense of mistake of fact, an affirmative defense to each of the charged offenses. He contends that although there admittedly was evidence sufficient to support the prosecution's theory that Melissa accompanied Staunton to the airport basement room because of her belief that she was compelled to accompany him on an airport tour, "there was also substantial evidence that appellant was honestly and reasonably mistaken about Melissa's intentions" and her willingness to participate in and consent to all the alleged sexual conduct. This, he contends, required the court to instruct the jury, sua sponte, on the defense of mistake in fact—that he could not be found guilty of the charged offenses if he reasonably believed that Melissa had engaged in a consensual act with him.

Penal Code section 20[1] provides that "In every crime . . . there must exist a union, or joint operation of act and intent, or criminal negligence," and the word "intent" in that provision means "wrongful intent." Section 26 provides that a person who commits an act under a mistake of fact disproving any criminal intent is incapable of committing the criminal offense. (See *People v. Vogel*, 46 Cal.2d 798, 801, fn. 2.) In *People v. Mayberry* (1975) 15 Cal.3d 143, our Supreme Court interpreted these provisions to mean

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

5

that a mistake of fact on the part of the defendant that is incompatible with the wrongful intent that is required to prove the offense thereby disproves his criminal intent. (*Id.* at pp. 153-157.) Staunton argues in this appeal that there was substantial evidence that he acted under a reasonable and honestly held belief that Melissa had consented to the acts with which he was charged, establishing grounds for an affirmative defense of mistake of fact and requiring the trial court to give the mistake-of-fact instruction, despite his counsel's failure to request it.[2]

We find Staunton's contention unfounded. It is unnecessary for us to examine his contentions that the law would require the court to instruct the jury, sua sponte, on the mistake-of-fact theory, for as we explain below, the verdict shows unequivocally the jury's rejection of the facts that would be required for that defense to apply here. Any error in the court's failure to instruct the jury on the mistake-of-fact defense was unquestionably harmless as a matter of law.[3] We therefore must affirm the judgment of conviction.

We assume (solely for the purpose of this discussion) that the court's failure to instruct the jury on the mistake-of-fact defense was error. But any such error was

---

[2] The instruction that Staunton contends should have been given is CALCRIM No. 3406, Mistake of Fact: "The defendant is not guilty of [the charged crimes] if he did not have the intent or mental state required to commit the crime because he reasonably did not know a fact or reasonably and mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as he reasonably believed them to be, he did not commit [the charged crimes]. [¶] If you find that the defendant believed that [Melissa had engaged in a consensual act with him] and if you find that belief was reasonable, he did not have the specific intent or mental state required for [the charged crimes]. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for [the charged crimes], you must find him not guilty of those crimes."

[3] Because the verdicts must be affirmed on each of these two grounds, we do not address respondent's contention that the evidence is not sufficient to show Staunton could have reasonably believed that Melissa consented to his conduct, in light of the undisputed evidence of his conduct under color of authority. (*People v. Maury* (2003) 30 Cal.4th 342, 424-425 [substantial evidence of victim's equivocal conduct justifying reasonable belief in consent is required to justify mistake-of-fact instruction].)

6

unquestionably harmless—and therefore cannot justify reversal of Staunton's convictions. (Cal. Const., art. VI, § 13.)

Under the *Chapman* standard of review for prejudicial error arising from a violation of federal constitutional rights, the question is whether the error was harmless beyond a reasonable doubt—whether the court can conclude beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].) Under the less rigorous *Watson* standard, reversal is warranted only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

The California Supreme Court has not definitively resolved whether an erroneous failure to instruct on mistake of fact is governed by the *Chapman* standard of prejudice or the *Watson* standard. In *People v. Salas* (2006) 37 Cal.4th 967, 984 the court assumed, but did not hold, that the *Chapman* test applies, finding that even if that standard applies, the error was harmless beyond a reasonable doubt. While some courts of appeal have held that the less-rigorous *Watson* standard applies (e.g., *People v. Sojka* (2011) 196 Cal.App.4th 733, 738 [*Watson* standard applies to determine whether erroneous failure to give mistake-of-fact instruction was prejudicial]; *People v. Zamani* (2010) 183 Cal.App.4th 854, 856 [same]; *People v. Russell* (2006) 144 Cal.App.4th 1415, 1431 [error in failure to instruct on mistake-of-fact defense is governed by *Watson* standard]), none have actually adopted the more rigorous *Chapman* standard. One recent case has declined to resolve which standard applies because the error in that case was prejudicial under either standard. (*People v. Andrews* (2015) 234 Cal.App.4th 590, 605-606.)

We adopt the approach of the Supreme Court in *People v. Salas* and the Court of Appeal in *People v. Andrews*. We need not determine in this case which of these standards would be required in a case in which the outcome of the issue was determinative, because here it is not. Here, as in *People v. Salas*, *supra*, even if the more rigorous *Chapman* standard is applied, any error in failing to give the mistake-of-fact instruction was harmless beyond any reasonable doubt. (*Id.* at p. 984.)

7

The count 3 verdict conclusively demonstrates the jury's rejection of the mistake-of-fact theory that Staunton was acting under an honest but mistaken belief that Melissa consented to the conduct for which he was convicted. The conduct underlying all three counts for which he was convicted took place in the airport basement. The jury found in count 3 that Staunton "intentionally and unlawfully" restrained, confined, or detained Melissa in that location, "by fraud or deceit." That determination demonstrates that the jury did not believe that Staunton had an honestly held belief (reasonable or not) that Melissa was engaging in consensual acts with him, for it found that he instead intentionally used fraud or deceit, knowingly misrepresenting the truth or intentionally giving her a false impression. The conduct that the jury found is inconsistent and incompatible with any possibility that he had an honestly held belief in Melissa's consent—the mistake-of-fact defense he urges the jury should have been instructed to consider.[4]

Thus, even if the jury had been instructed that he would not be guilty of the charged offenses if he had a reasonable and honestly held belief that Melissa had engaged in a consensual act with him, as he argues it should have been, the result would not have been more favorable to him. The jury necessarily concluded that Staunton did not act under any honest misimpression about Melissa's consent; he knowingly misrepresented the truth to her, or intentionally gave her a false impression in order to get her to the airport basement, to confine or restrain her there, to reach under her dress and induce her to spread her legs, and to touch her vagina. Those findings of the jury were wholly independent of the failure to give the mistake-of-fact instruction. Therefore even if the court erred by failing to give the mistake-of-fact instruction sua sponte, that error was necessarily harmless and had no effect on the trial's outcome.

---

[4] Staunton's counsel did not expressly argue to the jury that Staunton's conduct resulted from of an honestly held belief in Melissa's consent, although he did argue that her conduct indicated her consent to Staunton's inappropriate advances. But as we find above, the jury unequivocally rejected any theory that Staunton's conduct resulted from honest misunderstanding.

**Disposition**

The judgment is affirmed.

NOT TO BE PUBLISHED.


CHANEY, J.


We concur:


ROTHSCHILD, P. J.


LUI, J.

9