Filed 10/22/21  P. v. Daniels CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES EDWARD DANIELS, JR.,<br><br>    Defendant and Appellant. | H046156<br>(Santa Clara County<br> Super. Ct. No. C1777634) |

Defendant James Edward Daniels, Jr. was convicted by a jury of assault by means of force likely to produce great bodily injury (Pen. Code[1], § 245, subd. (a)(4)), and he admitted three prior strike allegations and one prison prior allegation.[2]  The court sentenced him to six years in prison.[3]

On appeal, he claims that the trial court prejudicially erred in (1) denying his request for an instruction on defense of property, (2) failing to ensure that a defense witness, who had not been subpoenaed, was available to testify or admit her hearsay statements, and (3) denying his post-trial *Marsden*[4] motion.  He also contends that (4) his trial counsel was prejudicially deficient in failing to seek mental health

_____

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] It took the jury less than 40 minutes to reach a verdict.

[3] The court refused to strike the strikes, denied defendant's section 17, subdivision (b) motion, imposed a doubled midterm for the assault count, and struck the punishment for the prison prior.

[4] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

diversion, and (5) we should review sealed records to determine whether the trial court should have disclosed additional documents to the defense. We have reviewed the sealed records and found no additional documents that should have been disclosed. We reject defendant's remaining contentions and affirm the judgment.

## I.    EVIDENCE PRESENTED AT TRIAL

Mariam Koshkakaryan was working as a court runner in downtown San Jose on October 27, 2017 shortly after noon. She was crossing the street when she heard defendant, whom she had never met before, making crude comments directed at her. He said: "Hey, baby. You have a fat ass. Let me get at that. You look fine." He got off his bike and began following her on foot. Defendant came up behind her, and she said "Hey, what's up." She told him something like: "Dude, you're crazy; stay away from me." Koshkakaryan told defendant to "fuck off" and used other profanities in an attempt to ward him off. Koshkakaryan, who had her phone in her hand, "felt threatened" so she tried to call 911.

Defendant "slapped the phone out of [her] hand," causing it to fall and break. He spit in her face and said: "Oh, you're a man. I could hit you if I want to because I see you as a man." She saw a "screwdriver" in the basket of his bike so she grabbed it to keep him from using it on her.[5] She picked her phone back up, called 911, and told defendant that she was calling the police. At that point, he "got really mad."

Koshkakaryan's 911 call was played for the jury. On the recording, defendant could be heard saying "I'm gonna break . . ." just before Koshkakaryan said "This guy's threatening me . . . ." She explained to the dispatcher that defendant was "following" her and was "trying to hurt me right now." Following an inaudible noise,

---

[5] Koshkakaryan explained at trial that she was "not really good with tools or what they are" and therefore called the item, which she later learned was a wrench, a "screwdriver." "Every tool is a screwdriver to me."

she said: "Ugh, he just fuckin' hit me across the head." Koshkakaryan could then be heard crying. She told the dispatcher that defendant had "[s]macked me across the head." Asked if defendant had any weapons, Koshkakaryan said: "He had a screwdriver . . . I took it from him." The dispatcher told Koshkakaryan that officers were on the way, but Koshkakaryan emphasized that she was working and needed "to go to work."[6] Koshkakaryan provided a detailed description of defendant and said she did not need medical attention. She was reluctant to wait for the police because she needed to go to work and "you guys aren't gonna do anything . . . ." However, the officers then arrived, and the call ended.

At trial, Koshkakaryan described how defendant had assaulted her. "[H]e full fisted swung around and whacked me across the head . . . ." Defendant "spun around in a circle and then just whacked me across the head as hard as he could" with a closed fist to the top right of her head above the ear. The blow caused her head to hit the side of a crosswalk pole, and she dropped her phone again. Koshkakaryan testified at trial: "He didn't deliberately try to hit m[y] head against the pole. . . . [¶] But he took it to a physical level, and he hit me full force across the head that caused me to hit my head" on the pole. Defendant struck her only once; "one strong punch." He did not kick her. Koshkakaryan had the tool she had taken from defendant in her hand when he punched her. After he punched her, Koshkakaryan screamed and picked up her phone, and defendant fled. She had only a brief encounter with the officers who arrived because she was in a hurry to complete her work assignment and did not feel that the officers were "really listening." Koshkakaryan thought the officers "just didn't care."

The police arrived within a few minutes of Koshkakaryan's call. A portion of their encounter with Koshkakaryan was captured on their body-worn cameras. When

---

[6] Koshkakaryan testified that she needed to go to Palo Alto to serve some papers.

3

the officers arrived in response to her 911 call, they observed that her face was "kind of red" and her eyes were "maybe watery." The officer did not recall seeing any visible injuries, and Koshkakaryan told the officer that she was "okay, dude." She told the officer that defendant had " 'rammed' " her head into a pole, which she pointed out. Koshkakaryan explained to the officer that defendant "did a, like a fucking weird ass turnaround, he gained like, fucking momentum, or something" and then "grabbed my head and he just whacked my head against it." Koshkakaryan said that defendant had punched her with a closed fist "[l]ike 3 times." She gave the officers the tool she said she had taken from defendant's hand. Koshkakaryan also told the police that defendant "started kicking me," "spit at me," and "broke my fucking phone." The officers were not able to locate defendant.

After defendant assaulted her, Koshkakaryan was "very dizzy" and "wasn't thinking straight," and her "whole body felt sore . . . especially [her] head . . . ." She could not recall which part of her head hit the pole. It was the force of defendant's punch that propelled her into the pole. She did not see a doctor for her pain because she had only "basic" health insurance that did not cover much. Koshkakaryan testified that "a head injury is not something that you see." Because she was concerned about getting her job done, she left, drove her car to Palo Alto, and completed her work assignment. She called her boss and told her boss about the incident, and her boss told her to go home, which she did. The next day she had a bump on her head, but she paid no attention to it. Koshkakaryan pointed out that she worked 90 hours a week.

On November 5, 2017, Koshkakaryan was returning to her downtown San Jose residence from the grocery store when defendant rode up to her on his bicycle and said: "Hey, I want to make up with you." She was "scared," ran into her home, and called 911 to report that defendant was outside her home. She told the dispatcher that defendant "beat the shit outta me" the previous week on the street. "[H]e took my

4

head and he whacked it against the pole."[7]  Koshkakaryan admitted that she had committed a shoplifting offense when she was a minor in 2011, for which she had suffered an infraction.

Defendant was arrested on November 10, 2017 after an officer saw him in downtown San Jose and noticed that he met the description that Koshkakaryan had provided.

## II.    DISCUSSION

### A.    *Request for CALCRIM No. 3476*

Defendant contends that the trial court prejudicially erred in denying his request that the jury be instructed on defense of property with CALCRIM No. 3476.

#### 1.    *Background*

The defense asked the court to instruct the jury with CALCRIM No. 3476. Defense counsel argued that "the timing of events that we have, the taking of the property from the alleged assailant and then only after that the alleged assailant applying force and response provides at least substantial evidence" to support the instruction.  The court found that "there is no substantial evidence" to support giving the instruction and denied the request.

The court instructed the jury on both assault by means of force likely to produce great bodily injury and the lesser included offense of simple assault.  "To prove that the defendant is guilty of this crime, the people must prove that the defendant did an

_____

[7] On cross-examination, Koshkakaryan admitted that she had made misstatements about the assault when she spoke to the police on November 5, 2017. She explained that she was "confused" and "overwhelmed" at that time.  Because she felt that the officers, who did not arrive for nearly an hour after she called 911, "didn't really care" and "were just downplaying what had happened to me," she felt the "need to exaggerate it a little bit."  Defendant was gone by the time the police arrived, and the officers did not seem anxious to find him.  She admitted that she had falsely stated that defendant " 'took my head and he whacked it against a pole.' "

5

act that by its nature would directly and probably result in the application of force to a person and that the force used was likely to produce great bodily injury." "Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm." Simple assault, on the other hand, required only an act that would "directly and probably" result in an "offensive" "touching."

The prosecution told the jury: "The ultimate question in this case is whether she was subjected to force likely to produce great bodily injury." The defense argued to the jury that Koshkakaryan was not a credible witness due to her theft conviction and her inconsistencies. "This case rests on her word and her word is worthless." The defense also argued that even if the assault had occurred, it was only a simple assault. It asserted that the force used was not sufficient to support the charged offense because Koshkakaryan had suffered no visible injury.

### 2. Analysis

"A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) "Although a trial court should not measure the substantiality of the evidence by undertaking to weigh the credibility of the witnesses, the court need not give the requested instruction where the supporting evidence is minimal and insubstantial. Doubts as to the sufficiency of the evidence should be resolved in the accused's favor." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145, fn. omitted.)

CALCRIM No. 3476 reads: "The owner [or possessor] of (real/ [or] personal) property may use reasonable force to protect that property from imminent harm. [A person may also use reasonable force to protect the property of a (family member/guest/master/servant/ward) from immediate harm.] [¶] *Reasonable force* means the amount of force that a reasonable person in the same situation would believe is necessary to protect the property from imminent harm. [¶] When deciding

6

whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable to protect property from imminent harm. If the People have not met this burden, you must find the defendant not guilty of" the crime. (CALCRIM No. 3476.)

Defendant claims that because Koshkakaryan "took appellant's wrench out of his bicycle basket before he ever struck her," there was necessarily substantial evidence that he was acting in defense of property. He cites section 693. The section provides: "Resistance sufficient to prevent the offense may be made by the party about to be injured: [¶] 1. To prevent an offense against his person, or his family, or some member thereof. [¶] 2. To prevent an illegal attempt by force to take or injure property in his lawful possession." (§ 693.)

Although Koshkakaryan did testify that defendant punched her *after* she took the wrench, there was no evidence other than simple temporal proximity linking defendant's act of punching Koshkakaryan to her act of taking the wrench from his bicycle basket. We reject defendant's claim that "timing itself" was sufficient evidence. No evidence suggested that defendant punched Koshkakaryan to "prevent" her from "tak[ing]" the wrench "by force" (§ 693), nor was there was any evidence that provided the slightest support for a reasonable belief that the wrench was in danger of imminent harm (CALCRIM No. 3476). Indeed, Koshkakaryan took the wrench only *after* defendant *threatened to hit her*, spat on her, and knocked her phone from her hand, and, as the 911 recording indisputably demonstrated, the punch occurred *after* Koshkakaryan had begun to report defendant's threatening conduct to the 911 dispatcher. On this record, there was not the slightest evidence that could have

7

supported defendant's claim that his punch was motivated by Koshkakaryan's taking of the wrench.

In any case, neither section 693 nor CALCRIM No. 3476 would apply merely because an assault was motivated by the taking of property. Section 693 applies only where the property owner acts to prevent another from taking property *by force*. CALCRIM No. 3476 applies only where the property owner acts to prevent *imminent harm* to the property. No evidence suggested that Koshkakaryan used any force to obtain or retain possession of the wrench or that she posed any danger of harm to the wrench.

We agree with the trial court that the requested instruction was not supported by substantial evidence.

### B.      *Potential Defense Witness*

Defendant claims that the trial court prejudicially erred by failing to ensure that a potential defense witness, Denise Duarte, was available to testify at trial and by refusing to admit her hearsay statements.

### 1.      *Background*

Defendant's trial counsel asked Koshkakaryan on cross-examination whether she had gone back to her office at 4:00 p.m. after the assault. Koshkakaryan responded: "Around 4:00 p.m., umm, I don't remember going back into the office. . . . [P]articularly that day the rest of the day is a really big blur to me . . . so I don't remember." When defense counsel pressed the point, Koshkakaryan testified that she did not go back into the office that day. Defense counsel then asked: "So if Denise Duarte said that you did come back to the office at 4:00 p.m. that day, would that be a lie?" Koshkakaryan replied: "If she did, then it could be."

The prosecution presented its case in a single day. At the end of the day, after the prosecution had rested, the defense affirmed that it had a single witness who would not be available until the next day. The next morning, the defense sought permission

8

to introduce Duarte's hearsay statements to the defense investigator that Koshkakaryan had actually returned to her office on the afternoon of the assault and shown no sign of visible injury. Defendant's trial counsel wanted to introduce Duarte's statements to attack Koshkakaryan's credibility and "more importantly . . . [as] relevant to . . . the degree of force used." He explained that his efforts to obtain Duarte's presence at trial had been fruitless as she refused to appear.

The court pointed out that Duarte had not been personally served with a subpoena and therefore the court could not order a body attachment. The court declined to grant a continuance. It noted that the defense had not entered into a valid standby agreement, due to the lack of Duarte's driver's license number on the agreement. And it concluded that a continuance would be unlikely to result in Duarte's appearance given the fruitless efforts the defense investigators had already made to obtain her presence. In addition, the court observed that Duarte had only "some nominal impeachment purpose" and was not a "material witness to this case." Finally, the court ruled that Duarte's hearsay statements were inadmissible because no exception applied. The defense rested without calling any witnesses.

### 2. Analysis

Defendant claims that the trial court violated his federal constitutional rights by failing to either grant a continuance so that Duarte could be properly subpoenaed or permit admission of Duarte's hearsay statements.

He maintains that the court's refusal to grant a continuance violated his constitutional right to compulsory process. "A continuance in a criminal trial may only be granted for good cause. (§ 1050, subd. (e).) 'The trial court's denial of a motion for continuance is reviewed for abuse of discretion.' [Citation.] 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is

9

denied.' [Citations.] [¶] In reviewing the decision to deny a continuance, '[o]ne factor to consider is whether a continuance would be useful.' " (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.)

Here, the trial court found that a continuance would not be useful because it was unlikely that the defense would be able to subpoena Duarte. The record supports this finding. The defense investigator had been trying to locate Duarte, and he had been completely unsuccessful. Duarte was actively trying to avoid testifying so it was very unlikely that she could be subpoenaed given the defense's lack of a home or work address for her.

The court also found that Duarte's proposed testimony would be of little value to the defense. The record supports this finding too. Whether Koshkakaryan returned to her office after the assault was of virtually no relevance since she had herself testified that she immediately returned to *doing her work* after the assault. The defense's apparent purpose in eliciting this testimony was to show that the punch had been so minor that Koshkakaryan was not affected by the assault. That she drove to Palo Alto and finished her work assignment fully addressed this point. Evidence that she returned to her downtown office several hours later would have added nothing except to show a minor inconsistency on a tangential point. Nor was there any significance to Duarte's proposed testimony that she observed no visible injuries when she saw Koshkakaryan that afternoon. Both Koshkakaryan and the police officer who responded to her 911 call on the day of the assault had testified that she had no visible injuries. Duarte's proposed testimony on this point would have been entirely cumulative.

Because the trial court could have reasonably concluded that a continuance was unlikely to produce Duarte's testimony and that the absence of Duarte's testimony was

10

immaterial to the defense, we find no abuse of discretion in the denial of continuance request.[8]

"A defendant claiming a denial of compulsory process must plausibly show that the missing testimony 'would have been both material and favorable to his defense.' [Citations.] Moreover, the constitutional right to compulsory process is not 'an unfettered right to offer testimony' that 'automatically and invariably outweigh[s] countervailing public interests.' [Citation.] A defendant claiming a violation of this right must establish both that he was deprived of the opportunity to present material and favorable evidence and that the deprivation was arbitrary or disproportionate to any legitimate purpose." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 367–368.) Here, the proposed testimony was not material to the defense, and the court's denial of a continuance was not arbitrary because it was based on proper grounds. It follows that defendant was not deprived of his right to compulsory process.

We also find no merit in defendant's claim that the trial court's refusal to admit Duarte's hearsay statements violated his due process rights to a fair trial and to present a defense. Defendant does not claim that Duarte's hearsay statements fell within any hearsay exception, and, as we have already discussed above, the offered statements were of little value to the defense as they were largely cumulative of other testimony. At best, Duarte's hearsay statements would have shown that Koshkakaryan was incorrect when she testified that she did not return to her office that afternoon, a point

---

[8] We note, as the trial court did, that section 1328d provides that a continuance is not available due to a witness's failure to appear where the requirements of that section have not been met. That section requires the witness to have provided her "driver's license number" if the subpoena has not been personally served. Even if that information has been provided, a body attachment is unavailable. (§ 1328d, subd. (a).) Here, Duarte did not provide her driver's license number, so not only was a body attachment unavailable but a continuance was also unavailable.

11

on which she was less than clear in her testimony. This was not "critical evidence" to which state hearsay rules must yield to protect a defendant's due process rights. (Cf. *Chambers v. Mississippi* (1973) 410 U.S. 284, 302.) Under the circumstances here, the trial court did not deprive defendant of due process by refusing to permit the introduction of Duarte's hearsay statements.

### C.     Denial of Defendant's **Marsden** *Motion*

Defendant contends that the trial court was required to appoint new counsel after trial because his trial counsel admitted that there would be a "conflict" if he brought a new trial motion, as requested by defendant, arguing that trial counsel was ineffective in failing to properly subpoena Duarte.

### 1.     Background

Between the jury's verdict and the sentencing hearing, defendant sent two letters to the trial court. The first letter, which was sent the day after the jury's verdict, was very brief. It asserted that he "did not have a fair court trial" and asked for a "new trial." Without elaboration, he said "ineffective counsel of [trial counsel]." Defendant also asked to be sentenced "as soon as possible, to file an appeal for due process violations." The second letter, which was sent more than three months later, asserted that his trial counsel was "totally ineffective at trial." He asserted that his trial counsel had been deficient in failing to properly subpoena Duarte, and he criticized Koshkakaryan's credibility.

At the commencement of the sentencing hearing, the court held a *Marsden* hearing to address the concerns that defendant had expressed in his letters. The court explained to defendant that he could "tell the Court anything that you want me to hear." Defendant said that he "went to trial" because he believed that Duarte would testify at the trial. His sole complaint about his trial counsel was that his trial counsel "didn't fill out the subpoena right" thereby depriving him of Duarte's testimony.

12

His trial counsel acknowledged that he "did make a mistake in this case" by telling his investigator that a standby agreement would be okay, instead of a subpoena, if Duarte "seems compliant." He explained that "my strategic thinking on that was I think it's potentially detrimental to the defense to subpoena compliant witnesses . . . because . . . it can sometimes cause them to get bitter or impatient, and understandably that could be directed toward defense counsel . . . ." His investigator thought Duarte was compliant and therefore did not serve a subpoena on her, but she ended up refusing to appear. Since the standby agreement, due to its lack of Duarte's driver's license number, was inadequate to compel her to appear at trial, defendant's trial counsel took responsibility for the failure to properly subpoena her. He explained to the court that defendant had subsequently "asked me to bring essentially an ineffective assistance of counsel claim against myself." Trial counsel noted that this "raises an inherent conflict" because "I would be put in the impossible position of being both the accuser and the accused."

The trial court observed that the "purposes" of Duarte's proposed testimony "were pretty minor points" and that "[t]he defense made the choice" not to subpoena her. The court concluded that "the decisions made by the defense" did not "rise to the level of ineffective assistance of counsel." It also found that there had been no prejudice due to the "minimal relevance" of Duarte's proposed testimony. The court ultimately found that defense counsel "adequately represented" defendant, "was very prepared for this trial," and "vigorously defended this case to the extent possible." It concluded that defendant's "tactic disagreement" with his trial counsel did not merit appointing a new counsel. The court therefore denied defendant's *Marsden* motion.

### 2. *Analysis*

Defendant recognizes that *People v. Smith* (1993) 6 Cal.4th 684 (*Smith*) governs this situation.

When a defendant makes a post-trial request for substitution of counsel, "substitute counsel should be appointed when, and only when, . . . the trial court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel . . . ." (*Smith*, *supra*, 6 Cal.4th at p. 696.) " 'When, after trial, a defendant asks the trial court to appoint new counsel to prepare and present a motion for new trial on the ground of ineffective assistance of counsel, the court must conduct a hearing to explore the reasons underlying the request. [Citations.] If the claim of inadequacy relates to courtroom events that the trial court observed, the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant. [Citation.] If, on the other hand, the defendant's claim of inadequacy relates to matters that occurred outside the courtroom, and the defendant makes a "colorable claim" of inadequacy of counsel, then the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial. [Citations.]' [Citation.]" (*Smith*, at pp. 692–693.)

"It is true that when a defendant claims after trial or guilty plea that defense counsel was ineffective, and seeks substitute counsel to pursue the claim, the original attorney is placed in an awkward position. The attorney must defend against charges from the very client he or she is supposed to be representing. The potential for conflict is obvious. But the same potential for conflict exists before trial as well. And the conflict is unavoidable." (*Smith*, *supra*, 6 Cal.4th at p. 694.) "Appointment of counsel for the purpose of arguing that previous counsel was incompetent, without an adequate showing by defendant, can have undesirable consequences." (*Id*. at p. 695.) "It is a matter of judicial discretion whether to substitute court-appointed counsel in the absence of a sufficient showing that a defendant's right to counsel would otherwise be substantially impaired." (*People v. Walker* (1976) 18 Cal.3d 232, 238.) "[A] bare assertion that inadequate representation should be urged as a ground for invalidating prior proceedings is insufficient to require appointment of different counsel—a

14

defendant must make at least a 'colorable claim' of ineffective assistance of counsel." (*People v. Crandell* (1988) 46 Cal.3d 833, 860, disapproved on a different point in *People v. Crayton* (2002) 28 Cal.4th 346, 365.)

The sole basis for defendant's motion was his trial counsel's faulty attempt to secure Duarte's testimony at trial. Defendant believed that this error by counsel was grounds for a new trial, and his trial counsel could not bring such a motion due to the fact that it would require him to accuse himself of being incompetent. Defendant argues that this situation required the trial court to appoint new counsel. We disagree.

This is analogous to the situation described in *Smith* where "the claim of inadequacy relates to courtroom events that the trial court observed," and "the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant." (*Smith*, *supra*, 6 Cal.4th at pp. 692–693.) Because the entire factual basis for the potential new trial motion had already been placed before the trial court in connection with trial counsel's efforts to obtain a continuance or admission of Duarte's hearsay statements, the trial court did not need to appoint new counsel in order to determine whether a new trial was merited due to ineffective assistance. Although trial counsel had erred in failing to secure a proper standby agreement, as the trial court explained, he had not been prejudicially ineffective because Duarte's proposed testimony was largely cumulative and immaterial. As the trial court could resolve the proposed new trial motion without appointing new counsel, it did not err in denying defendant's *Marsden* motion.

### D. Mental Health Diversion

Defendant claims that his trial counsel was prejudicially deficient in failing to request mental health diversion for defendant.

Section 1001.36 took effect between defendant's trial and his sentencing. Under that statute, a defendant can obtain mental health diversion only if "[t]he court is satisfied that the defendant will not pose an unreasonable risk of danger to public

safety, as defined in Section 1170.18 . . . ." (§ 1001.36, subd. (b)(1)(F).) In this case, at a pretrial bail hearing, the court found that, even though defendant was receiving services, there was "clear and convincing evidence" that defendant still posed "a clear risk to public safety." The court said: "[I]f this isn't a threat to public safety, I don't know what is, you know, in light of his history." "Mr. Daniels is a risk to public safety." After trial, defendant wrote to the court and asked to be sentenced as soon as possible.

While defendant's trial counsel was clearly aware of defendant's "mental health issues," we find no deficiency in his failure to request mental health diversion under these circumstances. The record does not disclose whether defendant opposed a request for mental health diversion, but his expressed desire to be sentenced as soon as possible suggests that he might have. Given the fact that defendant had already been found to pose a "clear risk to public safety," which made success on a mental health diversion request unlikely, defendant's trial counsel could have reasonably decided that, due to his client's eagerness to be sentenced, it would be imprudent to make that request. The reasonableness of such a decision was borne out at the sentencing hearing. The trial court declined to strike the strikes or reduce the offense to a misdemeanor due to defendant's lengthy criminal history of violence and his threat to public safety, and it noted that defendant had not shown that he "wish[es] to" address his mental health or substance abuse issues and that he had "chosen" not to in the past. On this record, we find no support for defendant's claim of ineffective assistance.

### E. Sealed Employment Records

Defendant asks us to review Koshkakaryan's sealed employment records to determine whether the trial court erroneously failed to disclose additional records to the defense. The defense subpoenaed Koshkakaryan's employment records. The records were sealed and reviewed by the trial court, which released one document from these employment records to the defense. We have reviewed the sealed records,

16

and there are no other documents that were material to the defense and should have been disclosed.  Consequently, the trial court did not err in failing to disclose additional documents from these records.

## III.  DISPOSITION

The judgment is affirmed.

_____

ELIA, ACTING P.J.

I CONCUR:

_____

DANNER, J.

*People v. Daniels*
H046156

**Grover, J., Concurring**

I concur in the result the majority reaches, but by different reasoning on the jury instruction issue. In my view, defendant was entitled to an instruction on the use of reasonable force to defend property, and the trial court erred by refusing his request. I would find the error harmless, however, because on this record I do not believe a different result would have obtained had the instruction been given.

A defendant is entitled to have the jury instructed on all legally valid defense theories that are supported by substantial evidence. (*People v. Salas* (2006) 37 Cal.4th 967, 982.) Substantial evidence means evidence which, if the jury were to believe it, could create a reasonable doubt as to the defendant's guilt. (*Ibid*.) Importantly, in determining whether substantial evidence supports a defense, the trial court must view the evidence in the light most favorable to the defendant (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137), without weighing the evidence or evaluating its credibility (*People v. Salas*, *supra*, at p. 982). If there is substantial evidence, the jury must be allowed to consider the defense, regardless of how plausible it may seem to the court. That permissive standard is necessary to avoid a significant impairment of the right to trial by jury: too much gatekeeping shifts the decision of whether the evidence establishes an affirmative defense from the jury to the court. (See *Apprendi v. New Jersey* (2000) 530 U.S. 466, 477.)

I believe substantial evidence supports a defense of property instruction here because it was undisputed at trial that the complaining witness removed a wrench from defendant's bike basket before he used the force alleged in the charged assault. There is also evidence indicating that the force came immediately after she took the wrench. To conclude that defendant's use of force was not a response to his property being taken would necessarily involve weighing the evidence, which the trial court may not do in deciding whether an instruction is warranted.

The evidence that the complaining witness took the wrench without consent, viewed in the light most favorable to defendant, would satisfy the additional requirement of a reasonable belief of imminent harm to the property. Surely the right to defend property from damage or harm extends to preventing it from being stolen. To construe "imminent harm" so narrowly as to encompass the former but exclude the latter would produce an untenable result.

I observe that although the relative strength of the defense is not the issue (only whether substantial evidence supports instructing on it), defense of property is a more plausible theory in this case than it might be otherwise due to defendant's particular circumstances. In considering the defense, the jury must evaluate "all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed." (CALCRIM No. 3476.) There was evidence defendant was experiencing homelessness at the time of the incident. And the perspective of a person in that situation regarding what is reasonably necessary to prevent an item of property from being taken may well be different from that of a housed person. (See, e.g., *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 745 [chronically homeless defendant's heightened sensitivity to aggression was a relevant consideration in evaluating self-defense claim].)

While I acknowledge that the evidence to support the defense may not be strong, it was enough to require an instruction on it. Because weighing the evidence to determine whether it establishes an affirmative defense is ultimately the role of the jury rather than the court, the jury should have been allowed to consider whether defendant's actions were taken to defend his property.

The California Supreme Court has not yet decided what standard of prejudice applies to a failure to instruct on an affirmative defense supported by substantial evidence. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 199.) Several times in the past two

2

decades the issue has been raised in the Supreme Court but not reached because in each case the failure to instruct either required reversal under any standard (in *People v. Mower* (2002) 28 Cal.4th 457, 484) or was harmless under any standard (in *People v. Salas*, *supra*, 37 Cal.4th 967, 984, and *People v. Gonzalez*, *supra*, at p. 199).

If not instructing on an affirmative defense is state law error, it requires reversal only where it is reasonably probable it affected the result. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  But if it is an error that infringes a right guaranteed by the federal constitution, the judgment must be reversed unless the prosecution shows beyond a reasonable doubt the outcome was not affected. (*Chapman v. California* (1967) 386 U.S. 18, 24.)  It appears to me that refusal to instruct on an affirmative defense supported by substantial evidence violates the federal constitution—at least where, as here, it denies the defendant an opportunity to present any affirmative defense at all.

The constitutional right to due process has long been understood to require that "criminal defendants be afforded a meaningful opportunity to present a complete defense." (*California v. Trombetta* (1984) 467 U.S. 479, 485.)  And it is settled that the right to present a defense includes the right to present evidence relevant to a defense theory. (*Washington v. Texas* (1967) 388 U.S. 14, 19.)  That right would be meaningless without a corresponding right to have the jury instructed on the theory to which the evidence relates.  If evidence is presented to establish a defense to conviction but the jury is not told the defense exists, then the defendant has not had the opportunity to present a complete defense.  The conclusion that due process requires a jury instruction on a legally valid affirmative defense supported by substantial evidence necessarily follows.

Four federal circuit courts have so held. (See *Bradley v. Duncan* (9th Cir. 2002) 315 F.3d 1091, 1099 ["[T]he right to present a defense 'would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense.' "]; *Davis v. Strack* (2nd Cir. 2001) 270 F.3d 111, 132 [failure to instruct on self-defense

3

violates due process unless it is "a fantastic, improbable defense that the jury was unlikely to adopt"]; *Barker v. Yukins* (6th Cir. 1999) 199 F.3d 867, 876 [a defendant "simply cannot be considered to have had a meaningful opportunity to present a complete defense" if the jury is not properly instructed on a matter critical to the defense]); *U.S. ex rel. Means v. Solem* (8th Cir. 1980) 646 F.2d 322, 331 ["Failure to give a theory of defense instruction is harmless error only where the failure to instruct could not have affected the outcome of the trial "beyond a reasonable doubt.' "].)  I agree with the federal courts' reasoning.  The logic that the right to present a complete defense requires an instruction on a defense theory supported by the evidence seems inescapable.

Some California cases have reached a contrary conclusion.  *People v. Watt* (2014) 229 Cal.App.4th 1215, 1219 (*Watt*), a receiving stolen property prosecution, found no constitutional violation for a failure to instruct on the affirmative defense of mistake of fact.  (The defense theory was that the defendant mistakenly believed the property was not stolen.)  The court considered the federal authorities supporting a due process right to an instruction on an affirmative defense but found them distinguishable because in each federal case the failure to instruct had deprived the defendant of the right to present a defense.  (*Id*. at p. 1220.)  The same consideration distinguishes *Watt* from this case.  In *Watt*, the requested mistake of fact instruction was essentially redundant, because under the instruction defining the elements of the crime, "the jury was still required to find beyond a reasonable doubt that defendant knew the items had been stolen."  (*Ibid*.)  Failure to instruct on the affirmative defense therefore did not affect the defendant's ability to argue that his mistake precluded a guilty verdict.  Because that avenue of defense was still available—as the *Watt* court correctly concluded—the defendant was not deprived of the right to present a complete defense.

But that cannot be said here.  Without an instruction on the affirmative defense of reasonable force to protect property, defendant was unable to argue that *even if he did*

4

strike the complaining witness, he was legally justified in doing so.  Defendant was limited to arguing that he did not use significant force toward the victim at all.  Unlike in *Watt*, defendant was foreclosed from pursuing a theory supported by substantial evidence.

Several other California appellate cases (*People v. Elize* (1999) 71 Cal.App.4th 605, 616; *People v. Hanna* (2013) 218 Cal.App.4th 455, 462; *People v. Zamani* (2010) 183 Cal.App.4th 854, 866; *People v. Villanueva* (2008) 169 Cal.App.4th 41, 53) have concluded that failure to instruct on an affirmative defense is not a constitutional error.  But each of those decisions did so based on *People v. Breverman* (1998) 19 Cal.4th 142 (*Breverman*), in which the Supreme Court held that failure to instruct sua sponte on a lesser included offense is state law error.  The *Breverman* court observed that "the United States Supreme Court has expressly refrained from recognizing a federal constitutional right to instructions on lesser included offenses in noncapital cases;" and its "decisions leave substantial doubt that the federal Constitution confers *any* right to lesser included offense instructions in noncapital cases." (*Id*. at p. 166.)

*Breverman* does not stand for the proposition that refusal to instruct on an *affirmative defense* is state law error.  To the contrary, the California Supreme Court has since specifically stated the issue remains open.  (*People v. Gonzalez*, *supra*, 5 Cal.5th 186, 189 ["[W]e have yet to determine whether a trial court's failure to instruct on a requested affirmative defense instruction supported by substantial evidence is federal constitutional error or state law error."].)  By relying on *Breverman* to conclude there is no constitutional right to an instruction on an affirmative defense, rather than a lesser included offense, the California appellate decisions did not analyze the due process principles implicated when a defendant is denied the right to present a theory of defense.  When those principles are given proper consideration, it becomes apparent the

5

constitution requires that the jury be instructed on a properly supported affirmative defense.

Consistent with the constitutional right to a meaningful opportunity to present a complete defense, I believe due process is violated when a trial court refuses to instruct the jury on a recognized affirmative defense supported by substantial evidence. Even under the corresponding *Chapman* standard for prejudice, however, I conclude that defendant was not prejudiced by the error here. Based on the evidence and verdict I am persuaded beyond a reasonable doubt that the inability of the jury to consider defense of property did not affect its verdict. Though sufficient to meet the low bar of warranting an instruction, the evidence that defendant used reasonable force to protect property was thin; it is unlikely any juror would have seen the evidence as a reasonable defense of property rather than an unjustified attack. Significantly, by convicting defendant of the Penal Code section 245, subdivision (a)(4) offense, the jury necessarily found he used force likely to cause significant injury, making it even less likely that defendant's actions would have been interpreted as a reasonable measure to prevent his wrench from being taken. I therefore agree that the judgment should be affirmed.

_____

GROVER, J.

**H046156** – *People v Daniels*